**UNITED STATES, Appellee,**

v.

**Sergeant Leonard L. BROWN, 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, United States Army, Appellant.**

**ARMY 9401494.**

U.S. Army Court of Criminal Appeals.

18 Dec. 1996.

---

For Appellant: Lieutenant Colonel Michael L. Walters, JA; Captain James W. Friend, JA (on brief).

For Appellee: Colonel John M. Smith, JA; Lieutenant Colonel Eva M. Novak, JA; Captain Joanne P. Tetreault, JA (on brief).

Before GRAVELLE, JOHNSTON, and ECKER, Appellate Military Judges.

## OPINION OF THE COURT

JOHNSTON, Judge:

Pursuant to his pleas, the appellant was convicted by a military judge of assault consummated by battery, aggravated assault (three specifications), and wrongfully communicating a threat in violation of Articles 128 and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 928 and 934 (1988) [hereinafter UCMJ]. Contrary to his pleas, he was convicted by a general court-martial composed of officers and enlisted members of wrongful appropriation of a motor vehicle, reckless driving, fleeing the scene of an accident, and resisting apprehension in violation of Articles 111, 121, and 134, UCMJ, 10 U.S.C. §§ 911, 921, and 934. The convening authority approved the adjudged sentence consisting of a bad-conduct discharge, confinement for five years, and reduction to Private E1.

The appellant asserts that he was prejudiced when the military judge excluded the testimony of a defense expert witness concerning mistaken eyewitness identification. Although we find that the military judge abused his discretion in excluding all testimony by the defense expert, the appellant was not prejudiced by the ruling.

An eyewitness identification at a photographic lineup resulted in criminal charges against the appellant for the theft of a utility company truck. The eyewitness, a Caucasian utility company employee, left his vehicle unattended with the keys in the ignition

while he entered a gas station convenience store. While filling the truck with gas, he noticed a person whom he later identified as the appellant talking on a pay telephone thirty-five to fifty feet away. After the employee paid for his purchase and exited the store, he was startled to see the utility company truck backing out of the station. At first he thought that the truck was being driven by a fellow employee who happened to be an African–American. Then he thought that the person he had seen on the telephone, who was also black, was taking the truck. The eyewitness was able to observe the driver "eye to eye" from a few feet away for only a few seconds. He also viewed the profile of the driver for approximately ten seconds as the vehicle departed.

The utility company eyewitness telephoned the police and reported that the truck had been stolen by a "black male who had on a baseball cap, and a dark windbreaker." Later the same day the truck was recovered after being wrecked during a police pursuit. The driver of the stolen vehicle fled from the scene on foot and was not captured.

The vehicle was impounded and taken to a storage lot. Several days later the police found an embroidered baseball cap underneath the seat of the truck. The cap had a large "A" on the front and the name "Brown" sewn on it. Several hours before the truck was stolen, a noncommissioned officer saw the appellant wearing a light blue outfit characterized as a "walking suit" and a baseball cap with an "A" on it. He was not wearing a dark windbreaker at that time.

The first time the eyewitness unquestionably saw the appellant's face was in a photographic array assembled by the civilian police several days after the incident. When presented with the photographs, the eyewitness selected the appellant's picture as being the thief and asked the police, "Was that him?" The police had included appellant's

picture in the photographic array, not because he was a specific suspect in the theft of the truck, but because he fit the general description of the thief and he was currently among those soldiers in trouble with the law.

At his court-martial, the appellant wanted to defend against the charges by presenting testimony from a psychologist who was an expert in cross-racial eyewitness identification. After the convening authority denied the request for the expert witness, the appellant sought to have the military judge review the request. See R.C.M. 703(d). Based upon proffers from counsel, the military judge determined that the witness was an expert in the psychology of identification, that there was a proper scientific and factual basis for the proffered testimony concerning cross-racial identification, and that the testimony would be relevant.

At the time the military judge made his ruling, it appeared that the outcome of the contested charges could turn on whether the members believed the accuracy of the cross-racial identification. Nevertheless, the military judge would not allow the expert to testify.[1] The military judge ruled that the issues adequately could be presented to the members by cross-examination of the eyewitness and appropriate instructions from the court rather than through testimony of an expert witness.

The military judge determined that the expert's testimony about the unreliability of the photographic selection or other identification of the appellant "would be very likely to cause the members to accept that conclusion" rather than the members weighing all of the factors "to make their own decision on the element of identification." Consequently he ruled, in accordance with Military Rule of Evidence 403 [hereinafter Mil. R. Evid.], that the "danger of unfair prejudice and misleading the members" outweighed the probative value of the expert's testimony.[2]

---

1. The military judge may have improperly evaluated the content of the proffers in deciding whether the eyewitness identification issue was critical. The distinctive baseball cap was the linchpin of the prosecution case. Defense counsel stated during his proffer that the appellant had lost the cap prior to the crime. Thus, at the time of the proffer, the eyewitness identification

was the only direct evidence linking the appellant to the larceny of the truck.

2. The military judge did not err in applying the correct analytical model to determining the admissibility of expert testimony. See United States v. Houser, 36 M.J. 392 (C.M.A.1993), cert. denied,

Prior to *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the federal circuits were divided on whether to admit expert testimony offered by the defense to attack the reliability of eyewitness identification. *See United States v. Hudson*, 884 F.2d 1016 (7th Cir.1989), *cert. denied*, 496 U.S. 939, 110 S.Ct. 3221, 110 L.Ed.2d 668 (1990). The current trend, however, is to admit expert testimony on the impact psychological factors such as stress, suggestibility, feedback, and confidence have on the reliability of an eyewitness identification when the identification is a critical issue in an case. *United States v. Garcia*, 40 M.J. 533, 536 (A.F.C.M.R.1994), *aff'd*, 44 M.J. 27 (1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 174, 136 L.Ed.2d 115 (1996). Moreover, as eyewitness identification becomes more central to prosecution cases, such testimony might become more crucial and appropriate. *See United States v. Jordan*, 924 F.Supp. 443 (W.D.N.Y.1996).

■ In military law, the application of Military Rules of Evidence 401 through 403 and Military Rules of Evidence 701 through 707 generally determines the admissibility of expert testimony. Expert testimony may be admissible if the scientific or specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue. Mil. R. Evid. 702. The rules are to be construed to secure fairness and eliminate unjustifiable expense and delay, so that the truth may be ascertained. Mil. R. Evid. 102. Applying these rules to the issue before us, we have determined that the military judge abused his discretion in totally excluding the proffered expert testimony because his reasoning is not supported in law or fact.

According to the defense proffer, the expert would have testified about the scientific basis for errors in perception, the difficulty of cross-racial identification, and the mental processes of memory. In addition, he would have applied those scientific principles to the facts of the case at bar. For example, he would have explained how the fleeting nature of the utility company employee's view of the perpetrator at the time of the theft affected the reliability of the identification, how the predominantly side view at the time of the crime was unlikely to be related to a front-view identification, and how the particular photographic lineup in this case was unduly suggestive.

■ We find that the proffered testimony was not so confusing as to warrant exclusion under Mil. R. Evid. 403. *See United States v. Combs*, 39 M.J. 288 (C.M.A.1994)(holding that forensic psychiatrist's expert testimony on issue of intent to kill was not excludable because of danger of confusion of issues under Mil. R. Evid. 403). Indeed, when eyewitness identification of a total stranger belonging to a different racial group is based on a fleeting observation under stressful conditions, "we fail to see how the only defense evidence directly attacking the Government's circumstantial identification evidence ... could ever be a waste of time, too confusing, or cumulative." *Garcia*, 40 M.J. at 538.

The proposed expert testimony about the impact of stress, excitement, and anxiety on the accuracy of eyewitness identification went beyond what an average court member might know as a matter of common knowledge. *Id.* at 537. Portions of the proposed testimony were counter-intuitive and flew in the face of common beliefs about how the eye and brain interact. This is the type of scientific and specialized knowledge that will assist the trier of fact in understanding the evidence. Mil. R. Evid. 702.

■ The military judge's ruling was based on a concern that the members would adopt the expert witness' conclusion that the eyewitness identification was unreliable. Under Mil. R. Evid. 704, however, an expert opinion is not inadmissible because it embraces the ultimate issue in a case. Giving the members information upon which to base a credibility determination is not a valid basis for excluding the testimony. *See United States v. Downing*, 753 F.2d 1224, 1229 (3d Cir. 1985), *aff'd*, 780 F.2d 1017 (3d Cir.1985). The military judge's concerns could be adequately addressed by properly instructing the members.

510 U.S. 864, 114 S.Ct. 182, 126 L.Ed.2d 141 (1993).

What is most troubling in this case is that the military judge did not allow the defense expert to testify *at all* in support of the defense theory of mistaken identification. *See Garcia*, 44 M.J. at 31 (finding harmless error where defense eyewitness identification expert was permitted to testify on a limited basis). Consequently, the defense counsel in this case was forced to build a defense solely on the basis of cross-examination that dealt primarily with perception and observation.[3] Because of the military judge's ruling, the defense counsel was unable to present expert testimony that would have been helpful to the members in regard to the precise problems encountered in eyewitness testimony: cognition, mental processes, and the susceptibility of memory to overt and subtle influences.[4] The expert witness was not allowed to testify about the interdependent relationship between the photographs and the eyewitness' memory of the actual incident.

The eyewitness testified that he initially thought the person driving away was a fellow employee who was black. That was the first indication of a possibly erroneous cross-racial identification. Then he testified that he realized that the person driving the vehicle was the same person he had observed using a telephone just outside the store. This was the second encounter where a possible erroneous cross-racial identification may have occurred. The expert witness could have testified about the mental and cognitive processes at work when the eyewitness may have linked the appellant's photograph to that of the driver of the stolen vehicle.

We are certain that expert testimony about cross-racial identification issues could have been presented to the members without being misleading or confusing. The military

judge, however, prevented the appellant from presenting any expert witness testimony for these appropriate areas of inquiry. Thus, we hold that the military judge abused his discretion in totally excluding the testimony of the expert for eyewitness identification issues. We do not grant relief, however, unless we find prejudice. UCMJ art. 59(a).

■ We need not decide whether the error in this case was merely an evidentiary one or whether it also implicated the appellant's constitutional right to present a defense. In either case, the same four-pronged analysis is used to test for prejudice:

First: Is the Government's case against the accused strong and conclusive? *United States v. Lewis*, 482 F.2d 632, 644 (D.C.Cir.1973).

Second: Is the defense's theory of the case feeble or implausible? *United States v. Lewis, supra* at 646.

Third: What is the materiality of the proffered testimony? . . . .

Fourth: What is the quality of the proffered defense evidence and is there any substitute for it in the record of trial?

*United States v. Weeks*, 20 M.J. 22, 25 (C.M.A.1985)(footnote omitted); *Garcia*, 44 M.J. at 32.

Applying this test to the facts of the case before us, we note the following:

First, the government's case against the appellant was strong, and could be characterized as conclusive. The circumstances surrounding the incident, the eyewitness identification, and the unique baseball cap all firmly tie the appellant directly to the wrongful appropriation of the truck. The strongest evidence may have been the Atlan-

---

**3.** Mistaken identification was the heart and soul of the defense case, even though that theory was contradicted by circumstantial and direct evidence. The expert witness testimony was critical if the members were to understand the scientific basis for evaluating the inherent problems in cross-racial identification, the indeterminate nature of cognitive processes, and the vagaries of recollected images and memory. Thus, while cross-examination may have been central to developing the basis for a defense, it is in conjunction with expert explanation that the cross-examination may achieve its full impact. In a case such as this, to say that cross-examination alone

is sufficient misperceives the interplay between the two evidentiary vehicles.

**4.** If the defense expert had been allowed to testify, the military judge may very well have been required to rule, under the provisions of Mil. R. Evid. 403, that the probative value of some portion of the testimony was outweighed by the danger of unfair prejudice or confusion. His ruling in this case, however, was that *all* the proffered testimony fell afoul of Mil. R. Evid. 403.

ta Braves baseball cap embroidered with the name "Brown." That cap was found inside the vehicle after the appellant jumped from it and fled from the police. The appellant stipulated that the cap was similar to one he had owned. Another witness, however, identified the cap as the one worn by the appellant on the day in question.

Second, we find, based on all the facts and circumstances of this case as presented on the merits, that the defense theory of mistaken identification was feeble and implausible. The defense theory would have only highlighted potential problems that might be encountered during an eyewitness identification. The eyewitness in this case, however, was definite and certain about his identification of the appellant as the person who drove away in the truck.

Third, although we find that the proffered testimony was material as to the accuracy of the eyewitness identification, the outcome of the trial was influenced by all the circumstances surrounding the incident, including the baseball cap.

Finally, we find that the quality of the proffered testimony was exceptional in regard to the scientific basis for issues of eyewitness identification. While the expert was well qualified in the areas of perception, cognition, and mistaken identification, those scientific issues had little if any impact on the outcome of the case. At most, that testimony would have assisted the members in evaluating the eyewitness identification from the defense perspective, for example, that the appellant merely looked like the driver of the vehicle.

We are reluctant to find prejudice when the members were well aware of the identification issues. Trial defense counsel raised eyewitness identification issues during voir dire. He questioned them about the difficulties likely to be encountered in identifying a total stranger. He also queried them about

the concept of cross-racial identification. Furthermore, trial defense counsel vigorously addressed eyewitness identification issues during argument before the members. Finally, we note that the military judge instructed the members about the difficulties of cross-racial identification and the influence that all the circumstances might have on a photographic lineup. While voir dire, argument, and instructions may not substitute for expert testimony, they show that the members were alerted to the pertinent issues. Having applied the four *Weeks* factors to this case, we find that the appellant was not prejudiced by the ruling of the military judge under the facts of this case.

■ Although not raised at trial or on appeal, we note that the appellant was convicted of resisting apprehension when he fled in the stolen vehicle and on foot from the civilian police. Mere flight is not sufficient for the offense. *See United States v. Harris,* 29 M.J. 169 (C.M.A.1989). The evidence presented at trial is legally and factually insufficient to sustain that charge.[5]

The remaining assignment of error and other errors raised personally by the appellant pursuant to *United States v. Grostefon,* 12 M.J. 431 (C.M.A.1982), are without merit.

The finding of guilty of Specification 1 of Additional Charge V is set aside and the Specification is dismissed. The remaining findings of guilty are affirmed. Reassessing the sentence on the basis of the error noted and the entire record, the sentence is affirmed.

Senior Judge GRAVELLE and Judge ECKER concur.

---

5. As to cases referred to trial after 10 February 1996, Article 95, UCMJ, was amended to make "flight" from apprehension a criminal offense. National Defense Authorization Act for Fiscal Year 1996, Pub.L. No. 104–106, § 1112, 110 Stat. 461 (codified as amended at 10 U.S.C. § 895 (1988)).