**UNITED STATES, Appellee,**

v.

**Leonard L. BROWN, Sergeant,
U.S. Army, Appellant.**

No. 97–0435.
Crim.App. No. 9401494.

U.S. Court of Appeals for
the Armed Forces.

Argued March 5, 1998.

Decided Oct. 1, 1998.

For Appellant: *Captain Arden B. Levy* (argued); *Colonel John T. Phelps II, Lieutenant Colonel Michael L. Walters,* and *Major Holly S.G. Coffey* (on brief), *Major Michael E. Hatch.*

For Appellee: *Captain Mary E. Braisted* (argued); *Colonel Joseph E. Ross, Lieutenant Colonel Frederic L. Borch III, Captain Elizabeth N. Porras* (on brief); *Captain Robert F. Resnick.*

Amicus Curiae: *Jerry A. Stevenson* (argued); *Thomas A. Morrison* (on brief).

*Opinion of the Court*

COX, Chief Judge:

The issues before us involve the admissibility of eyewitness-identification expert-opinion evidence. At trial, appellant requested an expert in the field of eyewitness identification, and the military judge denied it. The Court of Criminal Appeals concluded that the military judge erred, at least in part. The Court of Criminal Appeals held that at least some of the expert's testimony, as proffered by the defense, was admissible and should have been received. Testing for prejudice, the Court of Criminal Appeals concluded, nonetheless, that appellant was not prejudiced by the exclusion of evidence in the particular circumstances of this case. Appellant challenges the correctness of the military judge's ruling and the appellate court's conclusion of no prejudice. 48 MJ 353 (1997). We agree that appellant was not prejudiced.

I

In June, July, and August 1994, appellant was tried by officer and enlisted members in a general court-martial at Fort Hood, Texas. Pursuant to his pleas, he was convicted of communicating a threat, aggravated assault (3 specifications), and assault consummated by a battery. Contrary to his pleas, he was convicted of resisting apprehension, reckless driving (causing an accident and injury), wrongful appropriation of a vehicle, and fleeing the scene of an accident.[1]

II

At the time of the events in question, appellant had recently returned to Fort Hood after a one-year unaccompanied tour in Korea. Appellant was assigned to a replacement detachment, but he had not completed in-processing into the detachment. He and his wife had had marital problems before he left for Korea, and the problems recommenced upon his return (i.e., "she wanted out").

On Thursday, February 24, 1994, appellant brutally assaulted his wife, and he was placed in military confinement overnight.

On the morning of Friday, February 25, 1994, Sergeant First Class (SFC) Columbus Davis, a member of the replacement detachment, was detailed "to get ... [appellant] in-processed in one day." SFC Davis assumed custody of appellant from the detention facility and was to escort him throughout the in-processing. SFC Davis was unarmed. Because appellant's medical and personnel records were at his quarters, it was necessary for SFC Davis to take appellant to his quarters on Fort Hood.

At the quarters, Mrs. Brown, appellant's wife, answered the door and admitted appellant and SFC Davis; then she retreated to the bedroom. Appellant pursued her there and proceeded to assault her. When SFC Davis heard the commotion, he entered the bedroom and separated them. Mrs. Brown escaped to a bathroom. Appellant verbally threatened SFC Davis. Then he went to the kitchen, obtained a long knife, and physically threatened SFC Davis with it. When appellant was unable to pry open the bathroom lock with the knife, he fled the scene. SFC Davis chased after him, but lost him. SFC Davis then had Mrs. Brown call the military police.

According to SFC Davis, when appellant fled he was wearing tennis shoes, faded light-blue jeans, a matching long-sleeved denim shirt, and a dark blue or black baseball cap with a white letter "A" on it. To SFC Davis, who had lived in the Killeen, Texas, area for 28 months, the cap "was very unusual, because it had a big alphabet on the front, and I was wondering what that alphabet stood for." Prosecution Exhibit 6 consists of two photographs of an Atlanta Braves-style baseball cap. The name "BROWN" is plainly

---

1. In violation of Articles 95, 111, 121, 134, and 128, Uniform Code of Military Justice, 10 U.S.C. §§ 895, 911, 921, 934, and 928, respectively. The members sentenced appellant to a bad-conduct discharge, confinement for 5 years, and reduction to Private E-1. The convening authority approved the sentence. The Court of Criminal Appeals dismissed the specification of resisting apprehension for insufficiency of the evidence as to the resisting element, but otherwise affirmed the findings and sentence. 45 MJ 514, 519 (1996).

visible on the outside of the cap. SFC Davis testified that Prosecution Exhibit 6 depicted the type of cap appellant had been wearing.

A few hours later that same day, at about 1:45 p.m., Mr. Kyle B. Heitmiller, an employee of TU Electric, was driving his company truck in nearby Killeen. Mr. Heitmiller stopped at a gas station to fill up his tank. As he drove into the station, he observed a man talking on a pay phone "about 35 to 40 feet" from where he stopped his truck. Mr. Heitmiller did not pay much attention to him, but he did notice that the person was a slim black male, about 6–feet tall, wearing blue jeans, a dark windbreaker, and a blue baseball cap with a white "A" on it. Mr. Heitmiller, who is Caucasian, did not know this man.

After filling the tank, Mr. Heitmiller headed for the station to pay for the gas, leaving the keys in the ignition. He got as far as the sidewalk in front of the building, when he turned around and saw that somebody was in the truck. He thought "for just a split second" that the person could be the fellow-employee he had worked with earlier that day, and that he was "just moving the truck." As he walked briskly toward the truck, Mr. Heitmiller realized immediately that it was not his fellow-employee.

Thereupon, Mr. Heitmiller ran to a point about 6 to 8 feet away from the truck—"[m]aybe a little closer"—as the driver was "fixing to put it in gear." As Mr. Heitmiller was running toward the truck, the man in the truck was "looking south through the windshield." When Mr. Heitmiller got close, the man "turned and made pretty good eye contact." Mr. Heitmiller and the man "went eye-to-eye." Mr. Heitmiller also got a good view of him from the side. Mr. Heitmiller estimated that he saw the man at the 6 to 8 foot range for "10 to 15 seconds." Then the man backed the truck out of the station "at a high rate of speed." Mr. Heitmiller gave chase on foot for about 30 yards.

Afterward, Mr. Heitmiller ran back to the station and called 911. He described the thief to the police as "a black male who had on a ball cap, and a dark windbreaker." In court, Mr. Heitmiller identified appellant as the thief. He also identified Prosecution Exhibit 6 as "appear[ing] to be the cap that he had on."

Later on Friday, February 25, Mr. Roy C. Pena, an off-duty employee of TU Electric, spotted the truck and followed it. The vehicle proceeded around Killeen, onto Fort Hood, through appellant's neighborhood, and back into Killeen. Eventually, the driver of the stolen truck pulled into an apartment complex parking lot and stopped. This allowed Pena enough time to knock on a stranger's door and call the Killeen police. As Pena was describing what had happened to the first responding officer, the driver of the stolen truck began to drive away. The police gave chase.

Ultimately, the truck ran a red light and collided with a taxi cab in an intersection, injuring the cab driver. The first officer arriving at the scene of the accident saw the driver emerging from the stolen truck, and he chased him on foot for some length. At several points in the foot chase, the officer got "within 10 to 15 feet" of the driver, but he could not catch him. The officer described him as a "black male, thin to slender build, between 5'10" and 6'1", dark clothing ... I can't remember exactly what kind of clothing he was wearing." The truck was taken to a wrecking yard for storage. The driver remained at large.

On the next day, Saturday, February 26, 1994, Mrs. Brown, along with the Browns' 2–year–old daughter, a female friend of Mrs. Brown, appellant's detachment commander, and his first sergeant, proceeded to the Browns' quarters in order to collect appellant's military gear—as well as to await a locksmith who was to change the locks in the quarters for Mrs. Brown's protection. Appellant was hiding in a closet with a butcher knife. When he was discovered, he jumped out and chased Mrs. Brown and her friend out of the house. Outside, the first sergeant managed to get between appellant and his wife, and she escaped into a neighbor's house. But appellant seized the baby and returned to his quarters. Ultimately, after several hours of negotiation, appellant surrendered to the military police and was

placed in pretrial confinement, where he remained until trial.

On the following Monday morning, Mr. Heitmiller and Investigator Reese Davis of the Killeen Police Department went to the wrecker's lot where the truck had been towed. When they arrived, the truck was in a locked garage, and they had to get someone to unlock the door. While walking around the truck and looking inside, Mr. Heitmiller saw a baseball cap on the floorboard, and Investigator Davis picked it up. The cap was "blue . . . with a red bill, and it had a script 'A' on it. The name 'Brown' was embroidered on the side." Two photographs of the cap were introduced in evidence as Prosecution Exhibit 6. *See* Appendix 1.

That same day, Monday, Investigator Davis went to the Fort Hood CID office where appellant was being processed. Investigator Davis obtained a photograph of appellant for the purpose of conducting a photo lineup. Investigator Davis testified without objection that, while there, he overheard appellant mention "that his leg had been injured running from the police."

On the next day, Tuesday, Mr. Heitmiller picked appellant's picture from a photo lineup conducted by Investigator Davis at the Killeen Police Department. Mr. Heitmiller was positive appellant was the thief.

At trial, appellant stipulated to the following facts:

> The accused admits that he is the owner of a blue baseball cap with a red bill, large "A" on the front, and "BROWN" embroidered on the outside, similar to the baseball cap which was found in the TU Electric truck by Mr. Kyle Heitmiller and Investigator Reese Davis on 28 February 1994.

### III

At trial, the defense made essentially three motions: First, they moved for the appoint-

ment of an expert as a defense consultant and member of the defense team, at government expense. The witness was to be Dr. Spurgeon Cole, Ph.D., of Greenville, S.C., an expert in the field of eyewitness identification and lineups. The defense presented a 7-page *curriculum vitae* of Dr. Cole. Dr. Cole was requested pertaining to Mr. Heitmiller's identification of appellant at the scene, in the photo lineup, and in court.[2]

The military judge was advised that the convening authority had twice denied the request to appoint or produce Dr. Cole. However, the defense was unable to articulate a case for the necessity of Dr. Cole's being appointed as a member of the defense team, so the military judge denied that aspect of the motion. The correctness of that ruling is not before us.

Next, the defense moved for the production of Dr. Cole as an expert witness, at government expense. In the alternative, the defense moved that Dr. Cole be allowed to testify if he were produced at appellant's expense.

The written motion sets out a summary of Dr. Cole's expected testimony. *See* Appendix 2. Counsel proffered that Dr. Cole would testify as to the following assertions:

1. "Dr. Cole will testify that the difficulties in perception . . . *indeed have in this particular case, render* [*sic*] *eyewitness identification unreliable.*"

2. "Dr. Cole will testify that Mr. Heitmiller *had errors in his perception . . . .*"

3. "Dr. Cole will testify that Mr. Heitmiller's identification of the perpetrator *is inaccurate* based on the difficulty in cross-racial identification. Mr. Heitmiller's eyewitness *identification was based on expectation . . . not what the perpetrator really looked like.*"

4. "Dr. Cole will testify regarding the theoretical basis of memory and how mem-

---

**2.** Pursuant to a defense request, the court members were not informed, during the merits portion of the contested case, of the offenses to which appellant had pleaded guilty. Thus, there was no testimony about any of the assaults. Regarding the events of February 24 and 25, 1994, the members learned that SFC Davis had taken appellant from confinement, that SFC Davis was escorting appellant through in-processing, and that appellant fled. The members did not learn of the reason for appellant's overnight confinement or of his assaults on Mrs. Brown and SFC Davis at the quarters.

ory can, and *has been in this particular case, been [sic] influenced by post-event activities.*"

5. "The expert will testify as to how the time, feedback from law enforcement officials, and subsequent introduction of the photographs *has resulted in misidentification* of SGT Brown as the suspect...."

(Emphasis added.)

These alleged conclusions of Dr. Cole were based on information previously supplied Dr. Cole by the defense. The totality of information supplied Dr. Cole was not revealed, but that which was revealed was later shown to be inconsistent with the evidence presented at trial. Thus, counsel proffered:

> Finally, as to difficulties in perception, Dr. Cole will testify about the external factors such as distance ["6 to 8 feet"], lighting [early afternoon, outdoors] and other external factors which affected Mr. Heitmiller's perception. The eyewitness *was not beside the truck as it drove away. The truck was at a distance from the door to the gas station where the eyewitness was standing.*

(Emphasis added.)

The Government challenged the scientific foundation of the proffered evidence, citing Mil.R.Evid. 702, Manual for Courts–Martial, United States (1995 ed.); *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); and *United States v. Rincon,* 28 F.3d 921 (9th Cir.1994). Trial counsel argued there were

> several factors that must be examined in order to determine whether or not the testimony by the expert is actually scientific knowledge. The defense has not even addressed this at all. No research has been submitted, nothing has been submitted, to verify the suggested five criteria: whether the theory in question be and has been tested; whether it has been subjected to peer review and publication; the known or potential error rate; the existence and

maintenance of standards controlling its operation; and the particular degree of acceptance within the scientific community.

The defense did not respond to this challenge.

The military judge's ruling on the motion to produce was quite extensive. For the purposes of the motion, he accepted Appellate Exhibit XIII (Appendix 2) "as an offer of proof of what Dr. Cole would testify to." In addition, the judge found that Dr. Cole was

> an expert in the general area of the psychology of identifications, and that there is no flat inadmissibility of that kind of expert testimony and it must be judged on a case-by-case basis in light of the specific offer of proof made by the defense.

*See* Mil.R.Evid. 702.[3]

The judge also found that Dr. Cole had a "proper basis" for his opinion, namely, "his knowledge of the facts of Mr. Heitmiller's identification at the scene and by photo lineup." And he found that the "matter of the accuracy of Mr. Heitmiller's identification" was "clearly a relevant matter." See Mil. R.Evid. 401, 402.

However, the military judge was not "satisfied ... that the probative value of Dr. Cole's testimony would outweigh the danger of unfair prejudice and misleading the members." *See* Mil.R.Evid. 403. In particular, the judge believed

> that the matters that Dr. Cole would testify to are *factors that are susceptible to being brought to the members' attention by instructions* on factors that they should consider as the trier of fact, in evaluating the reliability of the pretrial identification at the scene and the reliability of pretrial identification by photographic spread.

(Emphasis added.)

The military judge was specifically concerned about

---

**3.** Mil.R.Evid. 702 states:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or edu-

cation, may testify thereto in the form of an opinion or otherwise.

The military·judge found that: (a) Dr. Cole was an expert on eyewitness identification; (b) his testimony had a proper scientific basis; and (c) his testimony was clearly relevant.

having the expert, additionally, provide the opinion that the pretrial identification at the scene, and/or at the photo line-up, *was* "*unreliable*" or words to that effect.... (Emphasis added.)

Ultimately, the judge concluded "that the probative value of the offered expert testimony by Dr. Cole is substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the members in connection with the issue of the reliability of photographic identification and subsequent identification." *See* Mil.R.Evid. 403. Thus, the proffered testimony was ruled out.

In denying the motion to allow the expert to testify not-at-government-expense, the judge made essentially the same ruling under Mil.R.Evid. 403.

## IV

The Court of Criminal Appeals characterized the judge's ruling under Mil.R.Evid. 403 as being based on the "danger of unfair prejudice and misleading the members." 45 MJ 514, 516 (1996). It held, under the circumstances, "that the military judge abused his discretion in *totally* excluding the proffered expert testimony because his reasoning is not supported in law or fact." *Id.* MJ at 517 (emphasis added). Specifically, the court mentioned "the scientific basis for errors in perception"; "the difficulty of cross-racial identification"; "the mental processes of memory"; "the impact of stress, excitement, and anxiety"; and the application of "scientific principles to the facts of the case" as being appropriate matters of expert testimony in this case. *Id.*; *cf. United States v. Combs,* 39 MJ 288, 291 (CMA 1994).

The lower court also found:

> The military judge's ruling was based on a concern that the members would adopt the expert witness' conclusion that the eyewitness identification was unreliable. Under Mil.R.Evid. 704, however, an expert opinion is not inadmissible because it embraces the ultimate issue in a case. Giving the members information upon which to base a credibility determination is not a valid basis for excluding the testimony. *See United States v. Downing,* 753 F.2d

1224, 1229 (3d Cir.1985), *aff'd,* 780 F.2d 1017 (3d Cir.1985). The military judge's concerns could be adequately addressed by properly instructing the members.

45 MJ at 517.

On the other hand, the court implied that some of the testimony may have been excludable. *Id.* MJ at 518 ("What is most troubling in this case is that the military judge did not allow the defense expert to testify *at all* in support of the defense theory of mistaken identification."). In its catalog of evidence that the military judge should have received, notably, the Court of Criminal Appeals made no mention of the matter that particularly concerned the military judge—the expert's alleged conclusion that the eyewitness was in fact mistaken.

Ultimately, the lower court concluded that the exclusion of the expert testimony was harmless. *Id.* MJ at 518–19. The court assigned four reasons why it found no prejudice, citing *United States v. Weeks,* 20 MJ 22, 25 (CMA 1985), and *United States v. Garcia,* 44 MJ 27, 32 (1996).

First the Government's case was strong and conclusive. The most important identification evidence was the distinctive Atlanta Braves baseball cap with the name "Brown" embroidered in the hat. Appellant stipulated that the hat was similar to one he owned, and another witness identified it as the hat Brown had on the day in question.

Second, the defense theory of mistaken identity was weak and implausible. The eyewitness was definite and certain of his identification of appellant as the person who drove away in his truck.

Third, although the proffered testimony was material as to the accuracy of eyewitness identification testimony, "the outcome of the trial was influenced by all of the circumstances surrounding the incident, including the baseball cap."

Fourth, although the expert was "well qualified in the areas of perception, cognition, and mistaken identification, those scientific issues had little if any impact on the outcome of the case."

Importantly, the court concluded:

We are reluctant to find prejudice when the members were well aware of the identification issues. Trial defense counsel raised eyewitness identification issues during voir dire. He questioned [the members] about the difficulties likely to be encountered in identifying a total stranger. He also queried them about the concept of cross-racial identification. Furthermore, trial defense counsel vigorously addressed eyewitness identification issues during argument before members. Finally, we note that the military judge instructed the members about the difficulties of cross-racial identification and the influence that all the circumstances might have on a photographic lineup. While voir dire, argument, and instructions may not substitute for expert testimony, they show that the members were alerted to the pertinent issues.

## V

To reiterate, appellant first challenges the correctness of the military judge's decision to exclude entirely the testimony of Dr. Cole, as proffered. That issue, however, is essentially overtaken by the Court of Criminal Appeals's decision. That appellate court held that a considerable portion of Dr. Cole's testimony, as proffered, should have been admitted. Appellant does not challenge the correctness of that portion of the lower court's opinion— nor does the Government. *See* Art. 67(a)(2), UCMJ, 10 USC § 867(a)(2) (certification of issues for review by Judge Advocate General). Therefore, we have no occasion to review the correctness of the Court of Criminal Appeal's decision in that respect. For the purposes of this review, we assume that the military judge erred in excluding at least some of the proffered testimony.

The Court of Criminal Appeals's conclusion is, in any event, consistent with numerous appellate opinions holding that, in particular circumstances, such evidence may be admissible. In *United States v. Downing,* 753 F.2d 1224, 1231 (3d Cir.1985), for example, the court did an exhaustive examination of state and federal opinions regarding eyewitness experts. The court concluded that "under certain circumstances expert testimony on the reliability of eyewitness identifications can assist the jury in reaching a correct decision and therefore may meet the helpfulness requirement of ... [Fed.R.Evid.] 702." [4]

In *State v. Whaley,* 305 S.C. 138, 406 S.E.2d 369, 371 (1991), the Supreme Court of South Carolina, Dr. Cole's home state, held that the exclusion of Dr. Cole's testimony, who as of 1991 had "published eight to ten articles and a textbook on the subject" of the psychology of eyewitness identification and had "qualified as an expert in more than fifty trials," [5] was an abuse of discretion. The court also observed that, in the case before it, Dr. Cole had "based his testimony on established techniques and authorities." *Id.* at 372 n. 2.

The court noted:

[A]n expert's testimony is admissible where ... the main issue is the identity of the perpetrator, the sole evidence of identity is eyewitness identification, and the identification is not substantially corroborated by evidence giving it independent reliability.

*Id.* at 372. In addition, "other factors favoring admission" include:

testimony that ... [the] assailant's features were partially obscured during the entire incident; the cross-racial nature of the identification; and the short length of time each witness was exposed to the assailant.

*Id.*

The *Whaley* court based its finding of "abuse of discretion" on a rationale much akin to that found in the cases cited by the Supreme Judicial Court of Massachusetts in *Commonwealth v. Santoli,* 424 Mass. 837,

---

**4.** It is interesting to note that, on remand to the District Court, the trial judge ultimately ruled that the expert testimony was inadmissible. His ruling was summarily affirmed by the Third Circuit. *United States v. Downing,* 753 F.2d 1224, 1226, 1230, 1238–42 (3d Cir.1985).

**5.** Another expert in this field, Dr. Elizabeth Loftus, has testified more than 140 times. E. Loftus & J. Doyle, *Eyewitness Testimony: Criminal and Civil* 299 (3d ed. 1997).

680 N.E.2d 1116 (1997). There, Chief Justice Wilkins summarized the law regarding admissibility of expert testimony on eyewitness identification as follows:

> Federal Courts of Appeals treat the question as one of discretion in the trial judge.... In State courts, judges have generally excluded expert testimony on eyewitness identification, and those decisions have been upheld on review....
>
> In a relatively small number of cases, the exclusion of expert testimony on eyewitness identification has been characterized as an abuse of discretion. The opinions that rule that the exclusion of the expert testimony was or may have been error are typically those where there was little or no evidence to corroborate the eyewitness identification....
>
> These latter cases were decided on fact-specific grounds.... The facts of this case, particularly the physical evidence, provide significant corroboration of the victim's identification. In such a case, we defer to the trial judge's discretion. There was no error in excluding the evidence.
>
> We grant that the rule to which we adhere may result in disparate treatment in similar cases. That is inherent in any grant of discretion to trial judges. Appellate courts have done little to guide the exercise of discretion in this area, except that a few courts have stated that some evidence corroborating the eyewitness identification is required if the expert testimony is to be excluded. The absence of appellate guidelines will likely persist unless and until learning about the reliability of eyewitness identifications becomes more developed.

*Id.* at 1118–20 (citations omitted).

Likewise, in *People v. Sanders*, 11 Cal.4th 475, 46 Cal.Rptr.2d 751, 905 P.2d 420 (Cal. 1995), where the court upheld the trial judge's exclusion of expert testimony concerning the unreliability of eyewitness identification, the impact of stress on memory, transformation of memory after an event, and the difficulty of cross-racial identification, the court distinguished its earlier case, *People v. McDonald,* 37 Cal.3d 351, 208 Cal. Rptr. 236, 690 P.2d 709 (Cal.1984), noting that:

> In *McDonald,* no evidence linked the defendant to the crime, apart from eyewitness identification. The eyewitness testimony was equivocal; several witnesses testified that their view of the crime was partially blocked and obscured by rush-hour traffic; one eyewitness asserted that the defendant was definitely *not* the killer. The defendant also had a strong alibi defense. We concluded that the eyewitness identifications were not corroborated by evidence that would lend them independent reliability.

46 Cal.Rptr.2d 751, 905 P.2d at 435. The *Sanders* court "emphasized" that the decision whether to admit or exclude expert testimony concerning the psychological factors affecting such identification remains with the discretion of the trial court. *Id.* at 436.

Interestingly enough, many appellate courts have found no abuse of discretion for the very opposite reason, i.e., that the "bulk" of such expert testimony is "squarely within the comprehension of the average juror." *Robertson v. McCloskey,* 676 F.Supp. 351, 354 (D.D.C.1988); *see also Commonwealth v. Ashley,* 427 Mass. 620, 694 N.E.2d 862, 866 (Mass.1998) ("Several of the expert's opinions concerned matters which an average juror would be familiar with through experience and common knowledge."); *United States v. Harris,* 995 F.2d 532, 535 (4th Cir.1993) (Absent a few "narrowly constrained circumstances, jurors using common sense and their faculties of observation can judge the credibility of an eyewitness identification, especially since deficiencies or inconsistencies in an eyewitness's testimony can be brought out with skillful cross-examination."); *United States v. Thevis,* 665 F.2d 616, 641 (5th Cir. 1982) ("To admit ... [expert] testimony in effect would permit the proponent's witness to comment on the weight and credibility of opponents' witnesses and open the door to a barrage of marginally relevant psychological evidence.").

Other courts have, like the trial judge here, concluded that the eyewitness issues could be adequately covered by cross-exami-

nation and instruction. E.g., *United States v. Smith*, 122 F.3d 1355, 1359 (11th Cir.1997) ("[D]efendants who want to attack the reliability of eyewitness recollection are free to use the powerful tool of cross-examination to do so. They may also request jury instructions that highlight particular problems in eyewitness recollection."); *Harris*, 995 F.2d at 536 ("[A]ny discrepancies in these testimonies were brought out or could have been brought out on cross-examination."); *Moore v. Tate*, 882 F.2d 1107, 1111 (6th Cir.1989) ("[T]he examination and cross-examination of . . . [the eyewitness] at trial afforded the jury an adequate opportunity to assess the reliability of her identification of [the defendant].").

In *United States v. Houser*, 36 MJ 392, 397 (CMA 1993), we established the following criteria for evaluating a request for the production of an expert witness:

(A) the qualifications of the expert, Mil. R.Evid. 702; (B) the subject matter of the expert testimony, Mil.R.Evid. 702; (C) the basis for the expert testimony, Mil.R.Evid. 703; (D) the legal relevance of the evidence, Mil.R.Evid. 401 and 402; (E) the reliability of the evidence, *United States v. Gipson*, 24 MJ 246 (CMA 1987), and Mil. R.Evid. 401; and (F) whether the "probative value" of the testimony outweighs other considerations, Mil.R.Evid. 403. The burden is on the proponent to establish each of these factors.

Although we have addressed questions regarding the testimony of eyewitness experts, *United States v. Garcia*, 44 MJ 27 (1996), we have yet to establish a "bright-line" rule as to when to require the production of defense-requested witnesses. *See United States v. Ruth*, 46 MJ 1 (1997); *United States v. Rivers*, 49 MJ 434 (1998).

■ On this record, again, we have no occasion to attempt to articulate any per se rule regarding eyewitness-identification experts, other than to say that, as a general matter, such evidence is not per se inadmissible under Mil.R.Evid. 702, 703, and 704. *See*

*Daubert*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469.

■ The military judge is the "gatekeeper" of expert-opinion evidence, as well as the ultimate decision-maker on whether to produce, at government expense, an expert witness. *See* RCM 703(d), Manual, *supra; United States v. Ruth, supra.* When called upon to do so, we test the exclusion of such evidence for "abuse of discretion" on the record of each case. Likewise, if we find that the judge erred in keeping out the evidence, we must test the error for prejudice. Art. 59(a), UCMJ, 10 USC § 859(a); *United States v. Garcia, supra.* There are simply too many variables presented in cases to fashion a bright-line rule.

## VI

■ Regarding that portion of the *proffered*[6] testimony of Dr. Cole that the Court of Criminal Appeals did not embrace and that the military judge excluded, namely the alleged opinion that the eyewitness identification was inaccurate, we find no error in the lower court's ruling. Expert testimony is admissible if it will "*assist the trier of fact* to understand the evidence or to determine a fact in issue." *Daubert*, 509 U.S. at 589, 113 S.Ct. 2786. "The subject of an expert's testimony must be 'scientific . . . knowledge.' The adjective 'scientific' implies a grounding in the methods and procedures of science." *Id.* at 589–90, 113 S.Ct. 2786 (footnote omitted).

Our review of the literature reveals nothing which suggests that experts have the ability to know when an eyewitness identification is accurate. And appellant has proffered nothing, either here or at trial, which suggests that such a foundation could be laid.

## VII

■ For the reasons well articulated by the Court of Criminal Appeals, we agree, in the circumstances of this case, that there was

6. We wish to make it clear that we make no intimation that we think Dr. Cole's actual testimony would have coincided with the proffer.

For the purpose of the ruling on this motion, both at trial and on appeal, the courts are limited to the four corners of the proffer.

no material prejudice to the substantial rights of appellant. Art. 59(a). The decision of the United States Army Court of Criminal Appeals is affirmed.

Judges CRAWFORD and GIERKE concur.

*APPENDIX 1*

 

Two photographs depicting the Atlanta Braves baseball cap of Leonard BROWN.

FOR OFFICIAL USE ONLY    P.E. 6

Other major league baseball teams with logos beginning with the letter "A" are the Astros, the Angels, and the Athletics.

Their logos are pictured below:

  

Astros        Angels        Athletics

*APPENDIX 2*

Dr. [Spurgeon] Cole, [Ph.D., of Greenville, South Carolina] will testify about the three components of eyewitness identifications: perception, memory, and recall.

Perception

Dr. Cole will testify that the difficulties in perception can, and indeed have in this particular case, render eyewitness identifications

unreliable. In this particular case, the various internal and external factors of perception have made perception difficult for the eyewitness, Mr. Heitmiller. Dr. Cole will testify that Mr. Heitmiller had errors in his perception due to the impact of the stress, excitement, and anxiety he was experiencing while a truck was stolen from him within seconds.

Mr. Heitmiller is Caucasian, while the alleged perpetrator is a "black man." Dr. Cole will testify that Mr. Heitmiller's identification of the perpetrator is inaccurate based on difficulty in cross-racial identification. Mr. Heitmiller's eyewitness identification was based on expectation; that is, what Mr. Heitmiller thought the perpetrator should look like, not what the perpetrator really looked like. The expert will also testify as to the scientific principle of how the eye works faster than the brain can assimilate the information perceived. Dr. Cole will testify that this scientific phenomenon in itself makes eyewitness identifications unreliable since the brain automatically fills in the gaps based on errors in perception. Dr. Cole will conclude that this concept is most relevant where the identification took place within a matter of seconds, as the identification did in this particular case.

Finally, as to difficulties in perception, Dr. Cole will testify about the external factors such as distance, lighting, and other external factors which affected Mr. Heitmiller's perception. The eyewitness was not beside the truck as it drove away. The truck was at a distance from the door to the gas station where the eyewitness was standing. The suspect was already seated in the vehicle, and only a profile was apparent. The eyewitness identified the purported suspect from a frontal view in a lineup and only narrowed his final choice by seeing a side view. The expert will testify as to how this method of analysis is scientifically unreliable.

Memory

He will testify that memory is a fluid and dynamic scientific process. Dr. Cole will testify regarding the theoretical basis of memory and how memory can, and has been in this particular case, been [sic] influenced by post-event activities. Mr. Heitmiller's initial description of the suspect was that of a "black man, 5′ 10″ and about 140 pounds." After 3 days had passed since the startling event, Mr. Heitmiller was shown a photographic lineup of suspects. The photographs were taken from the shoulders up and both frontal and side views. (Except one suspect did not have a side view taken). Mr. Heitmiller, even though he observed the perpetrator who was seated in the driver's side of the truck, was asked to pick out the individual who looked like the suspect who took the vehicle. Mr. Heitmiller was told he correctly identified the man in custody at that time. The expert will testify as to how the time, feedback from law enforcement officials, and subsequent introduction of the photographs has resulted in a misidentification of SGT Brown as the suspect who allegedly stole the TU Electric truck. To accomplish this, expert testimony must be presented regarding the theory of memory and the influence on this concept by the specific post-event activities.

Recall

Dr. Cole will testify that recall is the final step in the analysis of the reliability and suggestiveness of an eyewitness identification. He will testify of the impact of "unconscious" suggestiveness in the lineup in this particular case. The expert will discuss the results of several scientific studies which have indicated how a "proper" lineup should be conducted. Dr. Cole will offer his expert opinion that the line-up shown to the eyewitness in this case was extremely suggestive and unreliable. The expert will testify as to how bias in the lineup due to inconsistency in the facial features, skin color, distance at which photos taken, difference in background, and manner in which the photographs were presented to the eyewitness, renders the eyewitness identification unreliable. The testimony of Dr. Cole will assist the trier of fact in concluding that any eyewitness identification was the result of a "show-up" and not the result of a lineup.

EFFRON, Judge (concurring):

I agree with the view in Judge Sullivan's separate opinion that federal civilian case law is in flux on admission of eyewitness identification. In my view, however, the majority's discussion of this matter confirms that the

state of the law is in flux and does not set forth a specific holding of this Court.

SULLIVAN, Judge (concurring in part and dissenting in part):

I agree with the Court of Criminal Appeals' resolution of this case on the basis of harmless error. Thus, I agree with the majority's adoption of *United States v. Garcia,* 44 MJ 27 (1996). On the more particular questions of legal error, I prefer to wait until the granted issues are ripe before deciding them. *See United States v. Brien,* 59 F.3d 274, 277 (1st Cir.1995) (federal case law in flux on admission of expert eyewitness identification testimony).