UNITED STATES

v.

Major David D. BLANEY, United
States Air Force.

ACM 32568.

U.S. Air Force Court of Criminal Appeals.

Sentence Adjudged 6 June 1996.

Decided 11 Jan. 1999.

Appellate Counsel for Appellant: William E. Cassara (argued), Lieutenant Colonel Kim L. Sheffield, and Major Margo Stone Newton.

Appellate Counsel for the United States: Major Bryan T. Wheeler (argued), Colonel Brenda J. Hollis, Lieutenant Colonel Anthony P. Dattilo, Lieutenant Colonel Michael J. Breslin, and Major Allen G. Erickson.

Before SNYDER, Senior Judge, MORGAN and SENANDER, Appellate Military Judges.

## OPINION OF THE COURT

SNYDER, Senior Judge:

Appellant was convicted, contrary to his pleas, by a general court-martial of forcible oral sodomy. Article 125, UCMJ, 10 USC § 925. He was sentenced to a dismissal, confinement for 3 years, and forfeiture of all pay and allowances. The convening authority reduced the confinement to 2 years but otherwise approved the sentence as adjudged. The appellant has submitted 14 assignments of error for our consideration.

We direct administrative relief for his *ex post facto* claim but, finding no error prejudicial to his substantial rights, we affirm.

## I. Verbatim and Complete Record

We first consider appellant's averment that the record of trial is incomplete and non-verbatim. The specific shortcomings asserted by appellant are that the military judge failed to place a Rule for Courts–Martial (R.C.M.) 802 session on the record and that the military judge's essential findings on interlocutory issues litigated at trial are not attached to the record. We disagree with the former and agree in part with the latter, but find no prejudice.

### A. R.C.M. 802 Conference

Appellant claims the military judge failed to make an adequate record of the substance of R.C.M. 802 sessions which dealt with his representation, thereby depriving him of a record of these critical matters. Upon convening the initial Article 39(a), UCMJ, 10 U.S.C. § 839(a), session of the trial, the military judge stated as follows:

> I would just like to put on the record at this point in time that we have not had any 802 sessions concerning this case; however, I have had telephone contact with both the government and Captain [C] on several occasions, basically dealing with the issue of representation of Major Blaney. At this point in time, the reason we're having this hearing is just to get on the record the representation issues that are involved. So, most of what we've discussed in those telephone conversations, I assume we will also deal with here today.

Referencing the allusion to the telephone calls, appellant argues the military judge was incorrect in stating there were no conferences, and reversible error occurred by not placing their substance on the record. *See* Article 54(c), UCMJ, 10 U.S.C. § 854(c). Appellate government counsel respond that, even conceding that the telephone conversations were R.C.M. 802 conferences, the military judge did all that the rule requires. We agree with appellate government counsel.

■ R.C.M. 802(a) provides that, "[a]fter referral, the military judge may, upon request of any party or *sua sponte*, order one or more conferences with the parties to consider such matters as will promote a fair and expeditious trial." The discussion to the rule, which is not binding authority, states that a conference may be conducted via radio or telephone. We agree with the discussion and specifically hold that telephone calls between the military judge and counsel regarding either a pending or ongoing trial are in fact conferences conducted under the auspices of R.C.M. 802. Our agreement with appellant that the military judge was incorrect when he stated that there had not been any "802 sessions," however, does not advance his ultimate argument.

■ As appellate government counsel's brief correctly observes, the military judge's remarks reflect full compliance with R.C.M. 802(b), which states that "[c]onferences need not be made part of the record, but matters agreed upon at a conference shall be included in the record orally or in writing. . . ." The fact that a matter has been discussed does not equate to an agreement. In fact, the military judge's remarks clearly reflect the issue of appellant's representation required on-the-record sessions. It would be odd indeed were we to hold a military judge errs, prejudicially no less, when, without objection, he/she states on the record either that no substantive matters were decided or agreed on by the parties in conference, or that an Article 39(a) hearing is convened to address what was discussed in a conference. That is not the law, and would be contrary to the spirit of R.C.M. 802, which is to promote judicial efficiency. *See* Drafters Analysis, *Manual for Courts–Martial, United States* (*MCM*) at A21–42–43 (1998 ed.).

■ Even if something of substance occurred in the telephone conferences, there also is the matter of waiver. After putting on the record the statement quoted, *ante,* the military judge stated, "[I]f there is anything in particular that either side wants to put on the record concerning those telephone conversations, please speak now." Both trial and defense counsel replied, "nothing." The last sentence of R.C.M. 802(b) states that, "[f]ailure of a party to object at trial to failure to comply with this subsection shall

waive this requirement." Had any matter of substance been settled and agreed upon during the telephone conversations, it was incumbent upon trial defense counsel to speak up and correct the record. This is especially so in light of the fact that the rule specifically prohibits either party from being compelled to agree to anything while in a conference. All parties retain the right to request an Article 39(a) hearing on any matter which may arise during a conference. R.C.M. 802(c).

Appellant seeks to avoid any application of the waiver rule of R.C.M. 802(b) by arguing that Article 54(c)'s requirement of a record of all proceedings may not be waived. He relies on *United States v. Sturdivant,* 1 M.J. 256 (C.M.A.1976), to support his position. *Sturdivant,* however, is distinguishable on its face. First, it involved an unrecorded sidebar conference in open court; and, second, the sidebar addressed challenges of court members. Both of these areas clearly are within the ambit of Article 54. Such is not the case with R.C.M. 802, which specifically states that conferences thereunder are not part of the record, and thereby are outside Article 54, UCMJ. *See MCM* at A21-43. Therefore, trial defense counsel's agreement with the military judge's summary waived any deficiency thereof. We now address the completeness of the record.

### B. Absent Document

■ Appellant avers that the record of trial was "authenticated haphazardly," and that the military judge's essential findings are not attached to the record of trial. In fact, all of the military judge's findings and rulings on the issues litigated at trial are attached to the record as required by R.C.M. 1103(b)(3)(A)(iv). Civilian appellate defense counsel concedes as much, but argues that appellant's copy did not contain the rulings in question and there is no assurance that the convening authority saw the rulings. As to the first assertion, civilian trial defense counsel did not include any objection to the completeness of the record of trial among the numerous assertions of error he submitted to the convening authority. Consequently, were the military judge's findings absent from his copy of the record, any error is

waived. *See* R.C.M. 1106(f)(6). Further, civilian trial defense counsel's extensive submission to the convening authority is replete with references to the military judge's rulings. We find it highly doubtful that civilian trial defense counsel would not have mentioned their absence had that been the case. As for civilian appellate defense counsel's second basis, the convening authority is not required to read the record of trial. R.C.M. 1107(b)(1).

There is the matter, however, of a document which the military judge did not make an exhibit or otherwise attach to the record. After entertaining argument on the defense's request for an expert witness at government expense, the military judge took the motion under advisement. He denied the request and provided trial and defense counsel a "short synopsis of my decision." He provided copies of the synopsis to each counsel, but with the proviso that, "I'll do this in more detail ... And while that's the primary reason for the denial, my written opinion may include other areas such as the timeliness issue." He did not, however, provide a copy of the synopsis to the court reporter.

■ Appellant asserts that the missing synopsis renders the record nonverbatim. We disagree. The issue here is not whether the record is verbatim but the statutory requirement that it be complete. Article 54, UCMJ; *United States v. McCullah,* 11 M.J. 234, 236 (C.M.A.1981). Just as an insubstantial omission does not render a record nonverbatim, neither does one render a record incomplete. *McCullah,* 11 M.J. at 237. A missing document may render a record materially incomplete without impacting the record's verbatim nature, but the missing matter would require testing for prejudice. *United States v. Wynn,* 23 M.J. 726, 728 (A.F.C.M.R.1986).

■ In the instant case, we deem the record complete. There are two ways to view the military judge's unusual manner of announcing his ruling. First, in view of the military judge's plain intent that the synopsis represented at most an outline of his thought process, providing the synopsis was essentially the same as announcing orally from the

bench, "motion denied, findings will follow." Viewed in this manner, the detailed written findings subsumed the synopsis, and there is nothing missing. The second way is to view the synopsis as the announcement and treat it as a missing document. In view of the military judge providing a copy to each counsel, we will proceed on the basis of a missing document. Even when viewed in this manner, we do not find the omission substantial or prejudicial.

All the evidence and arguments on which the military judge based his ruling are contained in the record. *Cf. United States v. Desciscio,* 22 M.J. 684, 686–87 (A.F.C.M.R. 1986) (unrecorded sidebar did not include basis of defense counsel's objection nor the military judge's overruling of it which in turn impacted ruling on evidence of extrinsic offenses). Further, the military judge attached his detailed ruling on the motion to the record when he authenticated it, which enables this Court to perform its function of appellate review. *Desciscio,* 22 M.J. at 688. Neither the brief of civilian appellate defense counsel nor the post-trial submissions by civilian trial defense counsel assert that there is any conflict between the synopsis and the detailed findings. Further, in this regard, there is no intimation by civilian appellate defense counsel that they are unaware of the contents of the synopsis. The sole apparent distinction between the synopsis and the detailed findings is, as the military judge signaled when he provided the synopsis, that untimeliness is included in his detailed findings as one of the reasons for denying the motion. Therefore, even assuming, *arguendo,* that the omission is substantial, thereby raising a presumption of prejudice, after drawing every inference against the government, we find the presumption fully rebutted. *McCullah,* 11 M.J. at 237 and cases cited therein.

## II. Severance of Attorney–Client Relationship

### A. Background

Appellant next avers that the military judge improperly severed the attorney-client relationship with his civilian counsel. This issue developed in a somewhat unusual man-ner. The military judge made the following findings as part of his ruling:

> On 6 March 1996, an Article 39(a) hearing was held in [appellant's] case to determine the accused's election of counsel. What precipitated this hearing was that the accused had previously retained a civilian defense counsel, Mr. Frank Spinner, to represent him in these proceedings. Mr. Spinner entered a notice of appearance on 23 October 1995.... On 21 December 1995, the charge was referred to trial by general court-martial. The court-martial was held in abeyance until 2 February 1996 at which time the [resignation in lieu of trial] was denied by the Secretary of the Air Force. Subsequent to the denial, Mr. Spinner requested a delay in the trial until April 15, 199[6]. While the undersigned was considering the request for delay but prior to making a decision, Mr. Spinner advised the court on 18 February 1996 that he was being released by his client and would no longer be representing him. On 29 February 1996, a trial date was set for 25 March 1996. Because of the release of the civilian defense counsel, an Article 39(a) hearing was held on 6 March 1996 to ascertain the accused's election of counsel. During that hearing the accused stated that he had "retained" civilian defense counsel, a "Mrs. Jane Siegel." At that time, there was no representation made by anyone that "Mrs. Siegel" was in fact an active duty Marine Corps Colonel. Specifically, the undersigned was under the impression that "Colonel" Siegel was a civilian. Detailed defense counsel was informed that the trial date was still 25 March 1996, but that the court would consider any request for delay once a notice of appearance was entered by "Mrs. Siegel" and her schedule submitted.
>
> On 7 March 1996, Colonel Jane Siegel entered a notice of appearance and request for delay until 26 May 1996. The letterhead indicates only "J.L. Siegel, Attorney At Law" but the signature block indicates, "Jane L. Siegel, Colonel, U.S. Marine Corps." In this notice and request, Colonel Siegel explained that she "will represent Major David Blaney in his upcoming general court-martial." She further indi-

cated that she had begun representing Major Blaney by submitting a discovery request through Detailed Defense Counsel. She then explains that "currently" she is on terminal leave with a scheduled retirement of 1 April 1996. She then states that she will not accept any compensation from Major Blaney for any work done while still "attached" to the Marine Corps and that she considers it essential that ties be severed before she comes to Okinawa. Curiously, she then states that she is the individual military counsel in a case scheduled for 2 April 1996, a date obviously subsequent to her scheduled retirement of 1 April 1996. . . .

On 18 March 1996, the undersigned granted a delay in the case until 28 May 1996. Subsequent to the granting of the delay it was brought to my attention by the Detailed Defense Counsel that Colonel Siegel would not be retiring on 1 April 1996 as previously stated and that it appeared her retirement had been pushed back to 1 May 1996. On 21 March 1996, Colonel Siegel informed the accused and Detailed Defense Counsel that she was being investigated by the Marine Corps concerning a case at Kadena Air Base, Okinawa (presumably the instant case). She stated that the "Armed Forces Legal Clinic and I will be unable to represent you." The undersigned received a copy of this letter from the Detailed Defense Counsel on or about 22 March 1996. Based on these concerns over the propriety of Colonel Siegel entering an appearance as a civilian counsel when in fact she was on active duty, I ordered a second pretrial Article 39(a) hearing to look into these matters.

Prior to entering his findings and ruling, the military judge invited counsel for both sides, including Colonel (Col) Siegel (an invitation which she declined), to submit memoranda of law on whether good cause existed to sever the attorney-client relationship. Appellant's objection notwithstanding, the military judge concluded there was good cause to sever the attorney-client relationship. The military judge concluded that, by definition, Col Siegel was not a civilian and that only her retirement would change that fact; *ergo*, she was ineligible to represent appellant as

civilian counsel. The military judge also concluded that Col Siegel would be in violation of the law if she continued as appellant's civilian counsel.

The military judge concluded that Col Siegel would violate 18 U.S.C. § 205 if she acted as civilian defense counsel before a court-martial prior to her retirement, and that "this court-martial has the inherent authority to sua sponte prohibit such conduct." He ordered the attorney-client relationship severed "to the extent one has been formed." However, the military judge also ruled that his ruling did not prohibit appellant from requesting Col Siegel's services as individual military counsel (IMC), *see* Article 38(b)(3)(B), UCMJ, 10 U.S.C. § 838(B)(3)(b), or prohibit Col Siegel's serving as civilian counsel provided she attained retirement status prior to the 28 May 1996 trial date. Appellant requested that Col Siegel be made available as IMC, but her commanding officer ruled she was not reasonably available, because Okinawa Air Base was over 100 miles from her place of assignment in San Diego, California, and for various administrative reasons, including the conduct of an inquiry into her prior involvement in appellant's trial, a shortage of field grade officers at her command, and the uncertainty of her retirement date.

### B. Discussion

The standard of review for this issue is *de novo*. *United States v. Iverson*, 5 M.J. 440 (C.M.A.1978). We accord the military judge's factual findings, however, the deferential standard of clearly erroneous. *United States v. Burris*, 21 M.J. 140 (C.M.A.1985). The military judge's findings are fully supported by the record and are accepted. Article 66(c), UCMJ, 10 U.S.C. § 866(c).

■ The first question we resolve is whether appellant and Col Siegel entered into a substantive attorney-client relationship rather than one in name only. *See United States v. Rachels*, 6 M.J. 232 (C.M.A.1979). We note the following: Col Siegel formally entered a written appearance as appellant's civilian counsel; she submitted a discovery request through detailed military counsel; and, presumably, conferred with detailed mil-

itary counsel regarding the charge and the government's case against appellant. Given these actions, we find that, whatever its propriety, an attorney-client relationship was established between her and appellant.

■ A finding of an existing attorney-client relationship requires that we review the military judge's ruling by the "standard applicable to the severance of an existing relationship rather than a mere denial of a request for counsel." *Id.* at 234. That standard, of course, is good cause. In light of the manner in which this issue evolved below; specifically, the fact that appellant retained Col Siegel as civilian counsel and also requested her as IMC, we conclude it is best to consider the issue a hybrid and analyze each aspect. Consequently, we are faced with a situation similar to the one in *United States v. Hardy*, 44 M.J. 507, 510 (A.F.Ct.Crim.App. 1996), where this Court observed, "none of the case law squarely addresses the appellant's situation." Nonetheless, as in *Hardy*, the precedents contain sufficient guidance for a reasoned result.

■ As this Court observed in *Hardy*, the seminal cases, and the near-strict liability rule they enforce, relate to the relationship between an accused and trial defense counsel; specifically, counsel officially *detailed* to represent an accused. *See, e.g., Iverson*, 5 M.J. at 442–43 and cases cited therein. The sanctity with which the military justice system holds the attorney-client relationship, notwithstanding, the courts have always examined the unique circumstances of each case when determining whether good cause exists to either sever an existing relationship or approve counsel's request to withdraw. *United States v. Smith*, 35 M.J. 138, 140–42 (C.M.A.1992) (detailed counsel compellable to testify against accused); *United States v. Gnibus*, 21 M.J. 1, 8–10 (C.M.A.1985) (different defense counsel detailed because accused in lengthy unauthorized absence status between withdrawal of initial charges and subsequent referral). None of the precedents to which appellate government and defense counsel have invited our attention address the situation of a military judge ruling on an application by civilian counsel to withdraw. This probably is because such matters are

worked out by civilian counsel and an accused out of court, and it is merely a matter of entering it into the record as in the instant case with Mr. Spinner's release by appellant.

This need not detain us, however, as the general rules applicable to continuing adequate representation are equally applicable to this case. In this vein, we note initially that, notwithstanding the military judge's concern with preventing the violation of the law in his presence, that was not the situation with which he should have had immediate concern. As appellate government counsel observed in their brief, whatever may have been Col Siegel's status with her superiors regarding the propriety of her off-duty then-current or prospective civilian practice and the Joint Ethics Regulation (which implements 18 U.S.C. § 205), the fact of the matter is that she had "withdrawn" from further representation of appellant via letter.

However, in view of appellant's professed desire for Col Siegel's continued representation of him, her letter of withdrawal was no more than an application for withdrawal subject to approval by the military judge. R.C.M. 506(c); *see United States v. Acton*, 38 M.J. 330, 337 (C.M.A.1993). Consequently, the military judge did no more than grant Col Siegel's application to withdraw from the case, and that is the situation to which we will apply the good cause standard. We hold the military judge did not err by granting Col Siegel's request to withdraw from the case, as good cause existed.

As detailed in the military judge's findings, Col Siegel was not then in a civilian status and, as her "letter of withdrawal" detailed, it was uncertain when she would be permitted to retire. Second, there was no averment by appellant or his counsel of record of any particular circumstance which rendered Col Siegel's services unique. Third, Col Siegel had not become so involved in the preparation of appellant's case that her withdrawal prejudiced his ability to present a defense. Indeed, the record does not reflect that they even had a face-to-face consultation. The military judge was not required to continue to grant appellant continuances indefinitely, especially in light of appellant's knowledge of Col Siegel's status when he "retained" her.

As this Court has held previously, while an accused is entitled to civilian counsel of choice, an accused is not entitled to a trial date of choice. *United States v. Grant,* 38 M.J. 684 (A.F.C.M.R.1993); *United States v. Dresen,* 36 M.J. 1103 (A.F.C.M.R.1993), *rev'd on other grounds,* 40 M.J. 462 (1994).

In the instant case, the military judge's "severing" of the attorney-client relationship between Col Siegel and appellant, by the terms of the ruling, was provisional at most. The military judge ruled that Col Siegel was eligible to represent appellant if she attained retirement status by the trial date of 28 May 1996, or was made available as IMC. In essence, all the military judge in effect did was to deny appellant a continuance until Col Siegel retired. This is similar to the situation in *Grant,* where we found no abuse of discretion by the military judge when he refused to grant a continuance until civilian counsel had served a suspension from practice imposed by his state bar. *Grant,* 38 M.J. at 689. Such decisions by a military judge are tested for an abuse of discretion. *United States v. Thomas,* 22 M.J. 57 (C.M.A. 1986); *United States v. Montoya,* 13 M.J. 268 (C.M.A.1982); *Grant,* 38 M.J. at 688.

In addition to the uncertainty of Col Siegel's future availability, the military judge also factored in and balanced the prior continuances granted appellant to obtain civilian representation and the fact that the victim's, Marine Corporal (Cpl) K's, reassignment back to the Continental United States for separation was rapidly approaching. Given these circumstances, the military judge did not deny further continuances because of mere administrative inconvenience or due to an arbitrary, myopic insistence on expeditiousness. *See Grant,* 38 M.J. at 689, and cases cited therein.

■ Even were we to hold the military judge erred in his decision, we would not find prejudice. In addition to the factors just listed, appellant was represented by military and civilian counsel, Mr. W. He was never without representation. *See Acton,* 38 M.J. at 336 n. 2. Before proceeding, we remind both the military and civilian bar which practices before Air Force courts-martial that counsel do not unilaterally withdraw from representation. R.C.M. 506(c) is very clear. In the absence of the expressed consent of an accused to military *or civilian* counsel's excusal, counsel must apply to the military judge for withdrawal.

■ We now consider the denial of appellant's request for Col Siegel as IMC and find appellant waived any further consideration of the decision of her superiors that she was not reasonably available. Objections relating to the denial of IMC must be made prior to the entry of pleas. R.C.M. 905(b)(6). The failure to make an objection generally constitutes waiver. R.C.M. 905(e). *See generally* R.C.M. 906(b)(2); *United States v. Redding,* 11 M.J. 100, 110–12 (C.M.A.1981); *United States v. Anderson,* 36 M.J. 963 (A.F.C.M.R. 1993).

■ When court convened on 28 May 1996, appellant was represented by new civilian counsel, Mr. W, and IMC, Capt J. Detailed counsel, Capt C, had been released at appellant's request. While again advising appellant of his rights to counsel, the military judge asked appellant by whom did he wish to be represented? Appellant responded as follows:

My original choice was to be represented by Col Jane Siegel who was to have retired by this point, however, that relationship was severed and she is—it turns out she is still on—she has not been released from active duty yet. So my choice is to be represented by Mr. [W].... And Capt [J]. Due to the fact that I cannot have Col Siegel.

Further, the military judge asked Mr. W if appellant desired to appeal the Marine Corps' determination that Col Siegel was not reasonably available. Mr. W answered, no, albeit with a proviso that his answer did not indicate agreement with the Marine Corps' decision on her availability. Nonetheless, he opted not to litigate the decision before the military judge so that a more complete record might be made. Further, unlike the accused in *Anderson,* there is no indication in the record that appellant appealed the matter administratively. *Cf. Anderson,* 36 M.J. at 971. There is nothing in the Marine Corps' decision or the record which reflects

any plain error of which this Court should take cognizance. Therefore, we find an affirmative waiver.

However, were we to review the denial of Col Siegel as IMC on its merits, we still would reach the same result. The standard of review of a denial of IMC is abuse of discretion standard. *Id.* at 973. The Marine Corps applied its service regulation on the matter to define reasonably available as allowed by Article 38(b)(7), UCMJ. Doing so, it determined Col Siegel was unavailable. Further, the decision authority cited the inquiry into the propriety of Col Siegel's actions as "civilian counsel," the demands of the office to which she had been assigned, as well as the uncertainty of her retirement date. Under these circumstances, we find no abuse of discretion. *Anderson,* 36 M.J. at 971.

### III. Destruction of Evidence

Trial defense counsel made a timely motion to dismiss the charge on the claimed ground that the prosecution had destroyed or failed to preserve exculpatory evidence in violation of the Due Process Clause of the Constitution. The evidence in question were the undershorts worn by the victim, Cpl K, on the day of the offense. As the military judge found at trial, investigators of the Air Force Office of Investigations (AFOSI), as a result of a Congressional inquiry prompted by the complaint of Mr. O, the occupant of the apartment where the offense occurred, deemed themselves under pressure to return all seized evidence. Further, the military judge found:

Mr. [O] was apparently anxious for the return of his couch.... It was determined by SA [H] that this couch had no further evidentiary value and could be returned to the owner.... SA [H] decided to review other evidence for disposition since he normally likes to dispose of as much evidence as possible on the AFOSI Form 158 that is presented to the legal office. As a result of the test results, which indicated there was no saliva constituents present, SA [H] believed the undershorts no longer had any evidentiary value. He believed that the laboratory report itself was the only evidence needed to support the proposition that no saliva was present on the undershorts. During this review, SA [H] consulted with other AFOSI agents who were evidence custodians. SA [H] specifically inquired of the other agents concerning the evidentiary value of the undershorts being held. The discussion took place prior to requesting the legal office to authorize disposition.... SA [H] then produced an AFOSI Form 158 which requested that the legal office approve of the disposition of several items being held in the AFOSI evidence locker. On 13 March 1996, SA [H] presented the form to Capt [R], the chief of military justice, requesting approval of the disposition of these items being held in the AFOSI evidence locker. Among those items were the undershorts in question. The suggested disposition was "Destroy at owner's request." The undershorts were disposed of by throwing them in a dumpster around 13 March 1996.

Although the military judge termed them "conclusions of law," as part of his ruling denying the motion, he also made the following additional findings:

I find that the exculpatory value of the evidence was not apparent at the time it was destroyed. The exculpatory value of the evidence which was known at the time of destruction was properly preserved in the laboratory report. No further testing for saliva could have enhanced the position of the defense that there was no "amylase activity" detected on the undershorts. To the extent that the defense desires to test the undershorts for the presence of some substance other than saliva, I find the evidence is of a nature that the accused is unable to obtain comparable evidence by other reasonably available means. To the extent that the defense desires to re-test for the presence of saliva, I find the laboratory report comprises comparable evidence.

I find that the actions taken by SA [H] in discussing the evidentiary value with other special agents and in ultimately getting the approval of the legal office to dispose of the evidence to be entirely reasonable under the circumstances. To the extent that

Capt [R] supported the AFOSI's requested disposition, I find nothing in the evidence before me to indicate anything other than a routine attempt to dispose of evidence that the government believed to have no evidentiary value. Whether the ultimate conclusion that the evidence had no evidentiary value is supported by hindsight is not relevant. I find that the actions taken at the time of disposition do not constitute bad faith on the part of the government.

Our standard of review on this issue is *de novo*. However, we review the military judge's factual findings on a clearly erroneous basis. *Burris*, 21 M.J. at 145. The factual findings are fully supported by the record. Article 66(c), UCMJ. We agree with the military judge that the defense did not meet any of the required three prongs of the *Trombetta* test, *California v. Trombetta*, 467 U.S. 479, 488–89, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984), and appellant is not entitled to any relief.

■ Destruction of, or failure to preserve, evidence does not entitle an appellant to relief on due process grounds unless *all* three conditions are present. They are: (1) the evidence possesses an exculpatory value that was apparent before it was destroyed; (2) it is of such a nature that the accused would be unable to obtain comparable evidence by other reasonably available means; and, (3) the government destroyed the evidence in bad faith. *Id.; Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988); *United States v. Garries*, 22 M.J. 288, 292–93 (C.M.A.1986); *United States v. Gill*, 37 M.J. 501, 506–7 (A.F.C.M.R.1993); *United States v. Anderson*, 36 M.J. 963 (A.F.C.M.R.1993); *United States v. Mobley*, 28 M.J. 1024, 1028 (A.F.C.M.R.1989).

■ While it is disturbing that a chief of military justice would concur with disposing of evidence connected with a docketed court-martial, poor judgment, or even ineptitude, does not equal bad faith. *Anderson*, 36 M.J. at 968. Even civilian trial defense counsel conceded that there was no bad faith involved in the disposal of the undershorts. Any exculpatory value of the undershorts was not asserted until civilian trial defense counsel disclosed a couple of potential theories of defense in connection with the request for the undershorts. As for the second prong of the *Trombetta* test, the military judge's finding is slightly ambiguous. At the time of his ruling, he ruled that there was no other reasonably available means by which appellant could obtain evidence other than the saliva test result. A day or so after his ruling, however, it was discovered that the laboratory had preserved cuttings from the undershorts which contained stains, and the cuttings were submitted to tests specifically requested by the defense. It is not clear from the military judge's ruling whether this fact was included in his finding on the second prong.

In any event, the record fully supports the military judge's conclusion that the undershorts had no exculpatory value which was, or should have been, apparent to the AFOSI and Capt R at the time the undershorts were disposed of. Further, the defense had all of the laboratory reports, as well as an expert witness who clarified and interpreted the test results where necessary. Last, but not least, the cuttings from the undershorts were available and subjected to a semen test as requested by the defense. Under these facts, there simply was no due process violation by the government.

■ Once again, we reinvent the wheel: staff judge advocates will be well served to instruct their staffs that it is good common sense to retain and preserve all evidence of a case which all know will result in a trial. Prosecutors rarely are successful in anticipating all potential uses to which skillful defense counsel can put evidence; and, therefore, no evidence should be disposed of prior to a case running its judicial course.

## IV. Denial of Expert Witnesses

### Background

The factual controversy which the members had to resolve in this case was straightforward. Mr. O hosted a going-away party for appellant at his apartment. The majority of the attendees, including appellant and Cpl K, were participants in the local Hash House Harriers, commonly called hashers (runners).

Cpl K testified that he fell asleep on a couch at about 0330 hours. At approximately, 0500 hours, he awoke to discover appellant performing fellatio on him. He stated that, at first, he thought he was dreaming, but realized it was no dream. Appellant continued to fellate him until Cpl K ejaculated and lost his erection, whereupon appellant pulled Cpl K's undershorts back up and returned to his place on the floor where he fell asleep. Cpl K was emphatic that, while he offered no resistance, he was fully awake and certain that appellant's oral sodomizing of him was real.

Appellant testified that he went to bed on the floor, between the couch where Cpl K was asleep and the table, around 0330 or 0400. After falling asleep, he awoke to find himself against the couch with his hand on Cpl K's thigh. He had no recollection of moving from his original position on the floor to the couch, but moved away immediately after realizing where he was. He denied sodomizing Cpl K.

Early in the trial's motions stage, trial defense counsel indicated the appellant's theory of defense would take two tracks: Cpl K had an erotic dream wherein he dreamed appellant orally sodomized him and had a nocturnal emission ("wet dream") as a result; and, appellant experienced a sleepwalking episode where he ended up against the couch whereon Cpl K was asleep, and inadvertently placed his hand on Cpl K's thigh. Pursuant to R.C.M. 703(d), trial defense counsel requested funding for Dr. Pascualy as an expert witness. The convening authority denied the request, and the request was renewed before the military judge. In support of this request, the defense proffered as follows:

> Dr. Pascualy is a forensic psychiatrist with special expertise which will assist the fact finder relative to sleep, sleep medicine, the science of parasomnia which is the study of sleep, the various states of consciousness which attend sleep, the ability to formulate conscious thought while in a semi-state of sleep, and the ability to accurately perceive one's surroundings and events while in a state of semi-sleep. The defense believes that the alleged victim in this case, Cpl

[K], was in a state of sleep or semi-sleep at the time he claims to have been assaulted by the accused. Dr. Pascualy will address Cpl [K's] state of sleep and/or semi-sleep and based upon the statement provided by Cpl [K] to OSI, will opine that his ability to relate events which may or may not have occurred was thereby significantly impaired, as well as his ability to distinguish between reality and dreaming.

The military judge denied the request. Applying the test of *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), he concluded that:

> In the instant case [the proffer of intended testimony] falls short of establishing the relevance and necessity required to order the production of the witness, Dr. Pascualy.... The proffer of expert testimony by the defense does not indicate the reasoning or methodology underlying the proffered conclusions of Dr. Pascualy and therefore, it is impossible to determine if the evidence is based upon valid scientific criteria. Additionally, the proffer does not include a discussion of how the reasoning or methodology can be properly applied in this case.

Subsequent to this ruling, trial defense counsel, again pursuant to R.C.M. 703(d), presented a motion for the funding of Dr. Annon, an expert on sleep disorders, as an expert consultant to the defense and as an expert witness. Appellant had personally funded Dr. Annon's travel from Hawaii to Okinawa. Civilian trial defense counsel's proffer on Dr. Annon was similar to the one for Dr. Pascualy but with two subtle differences. It stated in part that:

> Dr. Annon has reviewed the statement of the alleged victim, and finds his statement that he thought he was having an erotic dream scientifically significant as well as the duration of the alleged victim's sleep prior to allegedly awakening. The defense believes that the government will claim that the alleged victim was in a hypnopompic state which prevented him from resisting any alleged assault in this case, which addresses the defense position that, at worst, this was a consensual sodomy, rather than forced. Dr. Annon has special

expertise in the area of hypnopompic sleep which the defense wishes to present to the members on the issue of force, consent and mistake of fact.

Contrary to the proffer for Dr. Pascualy, the one above prays that expert assistance is needed to present a defense of consent or mistake of fact and is completely silent on the subject of appellant having a sleep disorder, *e.g.*, sleepwalking.

Trial counsel filed a Motion *In Limine* to suppress the testimony. After hearing Dr. Annon's testimony and argument of counsel, the military judge granted the motion. The military judge recognized Dr. Annon's considerable expertise and the legitimacy of his discipline. Nonetheless, based on Dr. Annon's testimony, the military judge found:

> Dr. Annon has not examined the accused or [Cpl K]. He has no expert opinion concerning the issues before the court. He cannot determine [Cpl K's] state of sleep on 15 August 199[5]. He cannot state what the probability of scientific certainty is because he doesn't know what the data are; and he is unable to get the data needed to draw any conclusions about the state of sleep in the instant case. He is not able to diagnose a sleep disorder in either the accused or [Cpl K] without doing an evaluation and he could not provide one during the week of the trial. Determining if someone had a sleep disorder 10 months ago would not be possible. If one is not observed in a laboratory setting the only way to determine if a person was experiencing a dream or reality is for that person to tell you. He has not reviewed the medical records of the accused.

The testimony of Dr. Annon would indicate that there is a certain amount of scientific validity to the study of sleep disorders. The second step under *Daubert* is to see if there is a 'fit' to the instant case. There is no showing that Dr. Annon's testimony could in any way assist the fact-finder in this case. Indeed, his ultimate conclusion was that the only way to tell if a person is dreaming or experiencing reality is to ask that person. Since [Cpl K] is present and available to testify, he is the only one in the position to be able to testify as to his

experiences. Thus, I find Dr. Annon's testimony to be neither relevant nor necessary.

### Discussion

Trial counsel, defense counsel, and the court-martial have equal opportunity to obtain witnesses and other evidence. Article 46, UCMJ. This provision, with regards to trial and defense counsel and the request for expert witnesses, is implemented by R.C.M. 703(d). As stated *ante*, requests for expert witnesses must first be presented to the convening authority and if denied, as it was in the instant case, renewed before the military judge. *Id.*

 Mil.R.Evid. 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

A military judge's ruling denying production of an expert witness, or an expert witness' expert testimony, is reviewed for an abuse of discretion. *United States v. Ruth,* 46 M.J. 1 (1997). The military judge commits error in excluding expert testimony only if his or her ruling is manifestly erroneous. *United States v. Rivers,* 49 M.J. 434 (1998) (citing *General Electric Co. v. Joiner,* 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)). After reviewing the proffers and the testimony of Dr. Annon, and the military judge's findings, we find no error in the military judge's ruling.

During oral argument, civilian appellate defense counsel averred that the ruling of the military judge excluding the testimony of the expert witness "cut the heart out of the defense's case" by preempting the role of the members; the military judge's concerns went to the weight of the evidence, not its admissibility. The main theme of counsel's oral argument on this issue was that expert testimony "should not be excluded merely because it will contradict the victim." While that statement is true in the abstract, so is its inverse proposition: neither should expert

testimony be admitted merely because it will contradict the victim.

 The sum of these propositions is that a military judge commits an abuse of discretion if expert testimony is excluded solely because of the conclusion the expert has drawn from supporting data. *See General Electric Co.*, 522 U.S. at ——, 118 S.Ct. at 519. The military judge does not, however, commit an abuse of discretion in performing the "gatekeeper function" mandated by *Daubert* by ensuring that the proffered evidence "fits" within the issues of the case at hand. *Id.; Daubert*, 509 U.S. at 591–92, 113 S.Ct. 2786; *see also Rivers*, slip op. at 32; *United States v. Brown*, 49 M.J. 448 (1998).

 The issue in this case is not the validity of the particular science involved, or the qualification of the proffered witness, but whether the evidence proffered would help the trier of fact. Mil.R.Evid. 702. In other words, the "fit" referred to in *Daubert*. Whether a military judge determines correctly if the proffered evidence "fits" is, of necessity, determined on a case-by-case basis. *Brown*, slip op. at 19. The measuring rod is the factors set forth in *United States v. Houser*, 36 M.J. 392 (C.M.A.1993). They are:

(A) the qualifications of the expert, Mil. R.Evid. 702; (B) the subject matter of the expert testimony, Mil.R.Evid. 702; (C) the basis for the expert testimony, Mil.R.Evid. 703; (D) the legal relevance of the evidence, Mil.R.Evid. 401 and 402; (E) the reliability of the evidence, *United States v. Gipson*, 24 M.J. 246 (C.M.A.1987); and Mil.R.Evid. 401; and (F) whether the "probative value" of the testimony outweighs other considerations, Mil.R.Evid. 403.

*Id.* at 397. The burden is on the proponent of the expert evidence to establish each of the required factors. *Id.*

 The respective positions of appellate defense and government counsel reflect that factors C through F are the primary ones in issue. We hold that the military judge did not err in finding that trial defense counsel failed to establish any of those factors. With regards to factor C, as Dr. Annon's candid testimony conceded, there were no data on which he could even begin to develop an opinion, as he had examined neither appellant nor Cpl K. Further, his testimony indicated that, even if he were able to obtain data in a laboratory setting, it would not establish whether Cpl K was asleep or awake on the evening in question, which was the indispensable core of the defense's theory. To the extent that any data obtained may possibly have enabled him to opine on the matter, his testimony did not address that area. There also is the matter of Cpl K's participation in any laboratory testing/monitoring of his sleep habits. Did the defense team assume consent or expect an order from the military judge? The defense's proffer did not address this facet of the relief requested. *See United States v. Owen*, 24 M.J. 390, 394–96 (C.M.A.1987).

Given the facts of the instant case and the way in which the proffer was presented and litigated, we can lump factors D through F together. Although trial defense counsel did not specifically state how Dr. Annon's testimony would establish whether Cpl K was asleep or awake, our reading of trial defense counsel's proffer and the questions asked Dr. Annon by trial defense counsel lead us to conclude that what the defense apparently was trying to establish, via expert testimony and any available scientific data, is that, if Cpl K's sleep patterns were monitored in a laboratory setting, the defense possibly could assert that he could not have been awake when he emphatically stated he was. The apparent theory suggested by trial defense counsel would be based on the time Cpl K testified he fell asleep and the time he awoke to appellant's fellating of him. The relevance of the elapsed time would be, given the time frame testified to, Cpl K was in Rapid Eye Movement (REM) sleep when one dreams, and he was in fact dreaming. But the person who should know, Cpl K, insists, no!

As our superior court commented in a *dictum*, in *Brown*, on expert testimony on eyewitness identification: "[O]ur review of the literature reveals nothing which suggests that experts have the ability to know when an eyewitness identification is accurate. And appellant has proffered nothing, either here or at trial, which suggests that such a foun-

dation could be laid." *Brown*, slip op. at 20. And that is the crucial weakness in appellate defense's assertion in the instant case. Nothing in the defense's proffer or Dr. Annon's testimony demonstrates that any amount of laboratory monitoring of Cpl K's sleep in June 1996, or expert testimony thereon, would have helped the members evaluate Cpl K's testimony that he was awake on 15 August 1995.

A common colloquialism sums up the essence of the defense's proffer and evidence—namely, "you can't get there from here;" "here" being "I was awake," and "there" being "no, you were asleep having a 'wet dream'." Even Dr. Annon testified that, for a past, non-monitored period of sleep, he would be dependent on what Cpl K told him. Another problem with the proffer is that Dr. Annon contradicted part of the proffer. Dr. Annon testified on cross-examination that, even if one is in REM sleep and dreaming, if awakened, the person would be fully coherent and able to distinguish a dream from reality. He also testified that stimulating a sleeping person to an erection could cause the person to awaken. Cpl K was subject to cross-examination on the issue and the court members were able to observe his demeanor and ability to recall events.

Although the proffered testimony and evidence may have met Rule 401's minimal threshold of logical relevance, it did not rise to the required level of legal relevance. *United States v. Sojfer*, 47 M.J. 425 (1998). The liberal standard of *Daubert* still is subject to the gatekeeping function of the military judge to ensure that scientific evidence and expert expert testimony will help the factfinder resolve the ultimate issue. *Daubert*, 509 U.S. at 591, 113 S.Ct. 2786. In light of the proffered evidence's inability to shed light on the event of 15 August 1995, it was insufficiently reliable to assist the triers of fact. Based on the state of the record before us, the military judge's ruling was hardly manifestly erroneous. He was well within his sound discretion when he ruled under Rule 403 that any probative value of the expert evidence and testimony was outweighed by its tendency to waste the court's time.

With regards to the request and proffer on Dr. Pascualy, it met only factor A. The military judge did not abuse his discretion when he concluded the proffer did not demonstrate how his testimony would be relevant to the proceedings or on what evidence or scientific principle any opinion rendered by him would be based.

■ With regards to the request for expert assistance to demonstrate that appellant had a sleep disorder, the defense failed to present any evidence at all tending to demonstrate either the existence of a disorder or that it played a part in the events of 15 August 1995. During Dr. Annon's direct testimony, he was asked only to define somnambulism (sleepwalking) and how it may manifest itself. There were no questions which would have elicited information on how it may have been germane to the trial. Further, when appellant, who is a physician, testified for the limited purposes of the motion, he conceded on cross-examination that he had never been diagnosed with any type of sleep disorder. The best he could claim was that once it was thought that he had narcolepsy, but that tentative diagnosis was withdrawn as mistaken. Even if appellant has narcolepsy, it is completely at odds with his testimony, for narcolepsy is a condition " 'characterized by episodes of uncontrollable drowsiness,' causing the individual involved to fall asleep suddenly." *United States v. Cooley*, 36 C.M.R. 180, 181, 1966 WL 4439 (C.M.A.1966). Narcolepsy is not sleepwalking. And again, there was no testimony from Dr. Annon on how any data he might obtain by monitoring appellant's sleep in June 1996 would enable him to render an opinion on appellant's actions on the morning of 15 August 1995.

We find no error in this case, but even if our conclusion were otherwise, we would find it harmless. Article 59(a), UCMJ, 10 U.S.C. § 859(a); *Rivers*, slip op. at 33; *Brown*, slip op. at 20; *United States v. Garcia*, 44 M.J. 27, 32 (1996); *United States v. Weeks*, 20 M.J. 22, 25 (C.M.A.1985). First, appellant presented his theory that Cpl K had a "wet dream" through cross-examination of Cpl K and the testimony of SA Salyards, a substitute expert witness ordered by the military

judge. Trial defense counsel, using the location of semen stains on Cpl K's undershorts, and the absence of evidence of saliva on them, as well as the absence of petechial hemorrhages on the roof of appellant's mouth, presented this theory to the members in full.

The prosecution's case in response, while not overwhelming in terms of the quantity of evidence, *cf. United States v. Garcia*, 40 M.J. 533, 539 (A.F.C.M.R.1994) ("[appellant] was his own worst enemy on witness stand"), was extremely strong and conclusive in terms of the quality of evidence. Cpl K is an infinitely credible witness. Every effort by trial defense counsel to attack his testimony, directly or indirectly, fizzled. The defense paralegal who took notes during Cpl K's pretrial interview by Capt C, and supposedly heard Cpl K state he was asleep on his stomach instead of his back per all of his pretrial statements and testimony at trial, was utterly destroyed on cross-examination. Trial counsel demonstrated overwhelmingly that, due to personal problems, she was inattentive during the interview and that her notes taken during the interview could not be trusted as reliable. Moreover, Cpl K's notes, which he took on his laptop computer during the interview and were authenticated by a judge advocate, also rebutted the attempt to show he was on his stomach.

There also is the matter of the prosecution's actual approach at trial. Contrary to the defense assertion in their proffer, the prosecution never asserted that Cpl K was in some sort of hypnopompic state which rendered him incapable of resisting. When asked what did he feel while appellant was fellating him, he testified that:

[I] "closed my eyes hoping that it would go away. And then when it didn't go away I just pretended I was asleep." [I] felt "panic, shock, I just—my body would not move, I would not move. It just was kind of like leave your body so that you don't have to go through something."

We do not read this testimony as Cpl K claiming he was in some sort of hypnopompic state. Instead, Cpl K's testimony reflects his astonishment at awakening to find an Air Force commissioned officer performing fellatio on him. An exchange during re-cross-examination vividly presents this facet of the case. Civilian trial defense counsel was suggesting that Cpl K was lying to prevent admitting he had a "wet dream" with homosexual overtones. Over prosecution objection, he pressed Cpl K on why he, a Brown Belt in Karate, did not physically resist appellant's acts if they in fact occurred. Then the proverbial one question too many:

Q: Wasn't there a lamp sitting on the table by the couch?

A: I believe there was.

Q: And you could have grabbed this lamp and hit Major Blaney on the head with it couldn't you?

A: That would have been assault on a commissioned officer.

Further, this is not a one-on-one case, for there is the evidence of the pretext telephone call.

The day after the incident, the AFOSI arranged for Cpl K to call appellant with SA Torres listening in on the conversation. While appellant did not outright confess during the conversation, the reasonable inferences to be drawn from it, was that he admitted to sodomizing Cpl K, appellant's denial at trial to the contrary notwithstanding. If appellant did no more than innocently place his hand on Cpl K's thigh while he was asleep and he only was trying to calm down Cpl K, we believe it doubtful he would have spent some 27 minutes talking and making comments such as, "I was trashed; don't know why I did it;" "all I can ask is that you forgive me;" "I f__d up, you can trust me;" "nobody else knows;" and, "because it's nobody else's business; I wouldn't put [my] job on the line;" if all he did was innocently place his hand on Cpl K's thigh. The members certainly could infer from this conversation that it reflected consciousness of guilt, as do we. Article 66(c), UCMJ. And there also is the evidence of appellant's demeanor when he was apprehended immediately after the pretext telephone call (the apprehending agent was outside appellant's office awaiting the radio transmission that the telephone conversation was finished). When he was informed he was under apprehension for sex-

ual assault, appellant dropped his head and nodded several times. During the search of his person incident to the apprehension, mint flavored condoms were seized.

The defense theory of the case that Cpl K was mistaken because he merely dreamed appellant orally sodomized him and then accused appellant of sodomy because of marital problems (which were not substantiated), on the other hand, was feeble if not implausible. Appellant's testimony that he was embarrassed over placing his hand on Cpl K's thigh and that Cpl K exaggerated the incident likewise is feeble. So is his claim that SA Torres either omitted what he really said during the telephone conversation or mischaracterized his responses to Cpl K. For example, appellant testified that where the agent's notes reflect that he said "things happen," he actually said to Cpl K, "nothing happened." SA Torres emphatically denied that he omitted anything said by either Cpl K or appellant, and the indicated pauses in his notes of the conversation reflected when neither person was talking.

On cross-examination, however, appellant admitted that when Cpl K accusingly shouted at him, "you sucked my dick!," he did not deny it, but supposedly did so later by saying nothing happened. All of the evidence convinces us that error, if any, was harmless beyond a reasonable doubt. While we apply the harmless beyond a reasonable doubt standard out of an abundance of caution, we do not believe that any error was of constitutional magnitude, because the defense was not deprived of presenting the defense of a "wet dream." *See Garcia,* 44 M.J. at 32.

### V. Other Offenses or Acts

■ Appellant also avers that the military judge committed prejudicial error when he admitted evidence of extrinsic acts in violation of Mil.R.Evid. 404(b). We disagree. The evidence complained of arose during the pretext telephone conversation between Cpl K and appellant. During the conversation, after Cpl K had directly confronted him with an accusation of oral sodomy, Cpl K asked, "You do this all the time?" Appellant responded, "Years ago when I was in college ... a couple of times." In response to the defense objection to the evidence, trial coun-

sel advised the military judge the evidence was offered as consciousness of guilt. The military judge admitted it on this basis.

The standard of review for this ruling is abuse of discretion. *United States v. Robles–Ramos,* 47 M.J. 474, 476 (1998); *United States v. Spata,* 34 M.J. 284, 286 (C.M.A. 1992). We find no abuse of discretion. A review of the entire telephone conversation clearly supports the probative value of the evidence in question. It more than meets all three prongs of the test in *United States v. Reynolds,* 29 M.J. 105, 109 (C.M.A.1989). The probative value of the evidence was not substantially outweighed by any prejudicial effect it may have had, Mil.R.Evid. 403, and the military judge provided the members an appropriate limiting instruction on the proper use of the evidence. Further, appellant had his say on the evidence when he testified that he merely was referring to a couple of instances where he fell asleep and awoke in an awkward position.

### VI. *Ex Post Facto Violation*

Appellate government counsel properly concedes this issue, as appellant's offense occurred prior to the effective date of the amendment of Article 57(a), UCMJ. *United States v. Gorski,* 47 M.J. 370 (1997). We will direct corrective action in the decretal section, *infra.*

### VII. Sentence Appropriateness

■ Appellant claims that his sentence is inappropriately severe. We disagree. In determining sentence severity, this Court must exercise its judicial powers to assure that justice is done and that the accused gets the punishment he deserves. Performing this function does not authorize this Court to exercise clemency. *United States v. Healy,* 26 M.J. 394, 395–96 (C.M.A.1988). The primary manner by which we discharge this responsibility is to give individualized consideration to an appellant, including the nature and seriousness of the offenses and the character of the appellant's service. *United States v. Snelling,* 14 M.J. 267 (C.M.A.1982). Applying this standard, we do not find appellant's sentence inappropriately severe. Article 66(c), UCMJ.

## VIII. Other Assignments of Error

A. Request for Mr. Price, laboratory analyst, as a witness. The military judge did not abuse his discretion in denying this request. The defense proffer did not attack the methodology used to test for semen stains or the presence of saliva or the results of those tests. *United States v. Strangstalien*, 7 M.J. 225 (C.M.A.1979). Further, the defense made full use of the laboratory reports, including the supplemental report prepared by Mr. Price, and SA Salyard testified as an expert to explain the results of the tests as well as any inferences drawable from the location of the stains on the underwear.

B. Defense counsel's objection to SA Salyard testifying on a flaccid penis causing spotting. The military judge, without objection, had already qualified SA Salyard as an expert witness in forensic science, which included the study of bodily fluids. We find no abuse of discretion in the military judge's ruling. *See United States v. Harris*, 46 M.J. 221, 224 (1997); *United States v. Mustafa*, 22 M.J. 165, 168 (C.M.A.1986).

C. Assistant Trial Counsel's sentencing argument. We find no prejudicial error in the argument regarding the necessity of Cpl K's testifying. The military judge promptly gave a curative instruction to the members out of an abundance of caution. Article 59(a), UCMJ. Further, we find no plain error with respect to the remainder of the prosecution's arguments. *United States v. Powell*, 49 M.J. 460 (1998) (amended Nov. 24, 1998).

D. Capt N's testimony on cross-examination that he believed the incident occurred. The military judge provided a curative instruction that the members were to disregard that portion of Capt N's testimony immediately after his testimony. We find no prejudice. Article 59(a), UCMJ.

E. Ineffective assistance of counsel. Appellant has not presented any evidence on how his accepting Mr. Spinner's advice to waive the Article 32, UCMJ, investigation was unreasonable or prejudicial. The fact that his current counsel, as a matter of practice, do not waive the Article 32 does not render Mr. Spinner's tactic in this case unreasonable. *See United States v. Henley*, 48 M.J. 864 (A.F.Ct.Crim.App.1998). Further, trial defense counsel's failure to renew their objection to investigators referring to Cpl K as the victim does not meet either of the prongs of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

F. Rules of post-conviction confinement facility. Appellant has not presented any basis for invoking our jurisdiction. *See United States v. Haymaker*, 46 M.J. 757, 760–61 (A.F.Ct.Crim.App.1997), *pet. granted*, 48 M.J. 453 (1998).

## IX. Decretal

The collection of adjudged forfeitures prior to the date of the convening authority's action pursuant to Article 57(a), UCMJ, 10 U.S.C. § 857(a), is declared to be without legal effect. Any such forfeitures already collected from appellant will be restored. The record of trial is returned to The Judge Advocate General for appropriate action. The case need not be returned to this Court following administrative correction unless further appellate review is required.

Accordingly, the findings and sentence are correct in law and fact, and are hereby

AFFIRMED.

Judges SENANDER and MORGAN concur.