# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 38962**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Husein G. KHAN**
Senior Airman (E-4), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 20 July 2017

————————————

*Military Judge:* Natalie D. Richardson.

*Approved sentence:* Bad-conduct discharge, confinement for 6 months, and reduction to E-2. Sentence adjudged 5 September 2015 by GCM convened at Eglin Air Force Base, Florida.

*For Appellant:* Major Annie W. Morgan, USAF.

*For Appellee:* Major Mary Ellen Payne, USAF; Major Meredith L. Steer, USAF; Gerald R. Bruce, Esquire.

Before MAYBERRY, HARDING, and C. BROWN, *Appellate Military Judges.*

Judge HARDING delivered the opinion of the court, in which Senior Judge MAYBERRY and Judge BROWN joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.**

————————————

HARDING, Judge:

Contrary to his plea, Appellant was convicted by officer members of one specification of sexual assault by causing bodily harm in violation of Article 120(b), Uniform Code of Military Justice (UCMJ), 10 U.S.C. §

920(b).[1] Appellant was sentenced to a bad-conduct discharge, confinement for six months, and reduction to E-2. The convening authority approved the sentence as adjudged.

Appellant asserts three assignments of error (AOEs):[2] (1) the military judge erroneously denied Appellant's motion to prevent Government consultation with Dr. GH given that Appellant's trial defense counsel had previously consulted with Dr. GH and that the convening authority had provided Appellant a less qualified substitute; (2) the military judge erred in denying a motion to dismiss the charges for a deprivation of choice of counsel; and (3) the military judge abused her discretion when she denied Appellant's motion to recuse herself. The issues raised by Appellant's second and third AOEs were previously brought before this court as a Petition for Extraordinary Relief in the Nature of a Writ of Mandamus and/or Prohibition, and denied.[3] Having reviewed these matters anew along with Appellant's first AOE, we find no prejudicial error and affirm.

## I. BACKGROUND

While deployed to Al Udeid Air Base, Qatar, in early 2013, Appellant met and befriended Senior Airman (SrA) AR. SrA AR occasionally visited Appellant in his dorm room. During one such visit, Appellant and SrA AR engaged in sexual intercourse. While SrA AR testified at trial that she had no recollection of the sequence of events leading to the sexual intercourse, she does recall telling Appellant to stop. Although Appellant initially denied any sexual activity with SrA AR when interviewed by Air Force Office of Special Investigations (AFOSI), he eventually admitted that he had sexual intercourse with SrA AR that

---

[1] Appellant was acquitted of a charge and specification of making a false official statement in violation of Article 107, UCMJ, 10 U.S.C. § 907.

[2] Although not asserted as an AOE, Appellant by way of a footnote brought to the court's attention a 9-day violation of the 120-day post-trial processing standard. Appellant does not assert prejudice but requests we grant "modest" relief under *United States v. Tardif*, 57 M.J. 219 (C.A.A.F. 2002). We decline to do so. In making our assessment, we are guided by factors enumerated in *United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), with no single factor being dispositive.

[3] *United States v. Khan*, Misc. Dkt. No. 2015-03, 2015 CCA LEXIS 355 (A.F. Ct. Crim. App. 24 Aug. 2015) (unpub. op.).

evening. Appellant further admitted that she told him to stop but that he "didn't stop for a minute or two."

## II. DISCUSSION

### A. Disqualification of Government's Expert Consultant

Appellant's original military defense counsel[4] determined that expert assistance from a forensic psychologist was necessary to defend Appellant. He contacted Dr. GH to discuss his availability as an expert for Appellant and shared some details about the case. Defense counsel then requested the convening authority appoint Dr. GH as Appellant's confidential expert consultant. The convening authority denied the request due to Dr. GH's unavailability for the initial trial date. Instead, the convening authority appointed Dr. MZ as the Defense expert consultant. Shortly after the denial of the Defense request for Dr. GH and the appointment of Dr. MZ, the Defense submitted a motion for continuance to accommodate the schedule of Appellant's newly-obtained civilian counsel, WC. The motion for continuance was granted and the trial date rescheduled. By the time the case went to trial nearly eight months later, the Government, due to an emergent potential disqualification of their expert consultant, obtained Dr. GH as its expert consultant for Appellant's case.

Appellant argues that the Government should not have been allowed to consult with Dr. GH due to the prior discussions between Dr. GH and his original military defense counsel. Appellant asserts that Dr. GH had a conflict of interest. Appellant also asserts that Dr. MZ's qualifications were not reasonably similar to those of Dr. GH, and therefore Dr. MZ was not an adequate substitute. Finally, Appellant claims that "the [G]overnment gamed the denial of the [D]efense request [for Dr. GH] in order to secure an expert more qualified that Dr. MZ" and that the "surreptitious choice to hire Dr. GH as their own expert was fundamentally unfair to Appellant and . . . resulted in a court-martial that, at a minimum, appeared unjust." For these reasons, Appellant avers that the military judge erred in denying his motion to disqualify Dr. GH from consulting with Government counsel. We disagree.

---

[4] Due to his separation from the United States Air Force in the fall of 2014, the original military defense counsel was released by Appellant before the case went to trial.

A military judge's denial of a motion to disqualify an expert is reviewed for an abuse of discretion. *United States v. Barron*, 52 M.J. 1, 6 (C.A.A.F. 1999). Likewise, a military judge's decision on a request for expert assistance is also reviewed for an abuse of discretion. *United States v. Ford*, 51 M.J. 445, 455 (C.A.A.F. 1999). "A military judge abuses his discretion when: (1) the findings of fact upon which he predicates his ruling are not supported by the evidence of record; (2) if incorrect legal principles were used; or (3) if his application of the correct legal principles to the facts is clearly unreasonable." *United States v. Ellis,* 68 M.J. 341, 344 (C.A.A.F. 2010) (citing *United States v. Mackie*, 66 M.J. 198, 199 (C.A.A.F. 2008)).

The military judge made detailed findings of fact that are well-supported by the record and we adopt them as our own. Foundational to Appellant's conflict of interest argument is that Dr. GH "consulted" with his original defense counsel and implicitly that such communications were covered by the attorney-client privilege. This argument fails as Appellant's counsel did not reveal to Dr. GH any attorney-client privileged or confidential communications with Appellant nor discuss any detailed case strategy. After reviewing the statements and other information regarding SrA AR, Appellant's counsel determined that expert assistance from a forensic psychologist was necessary and contacted Dr. GH to determine his availability. The defense counsel relayed to Dr. GH limited information about the case from SrA AR and Appellant's statements to investigators. The information discussed mirrored the substance of the written request for appointment of Dr. GH submitted to the convening authority. Dr. GH in turn provided an email detailing his schedule. The characterization of Dr. GH's communication with Appellant's counsel as a "consultation" misses the mark. On the facts of this case, we agree with the military judge's conclusions that the initial discussions about Dr. GH's schedule and whether he could provide expert assistance were not privileged or confidential communications and that Dr. GH was not conflicted from consulting with the Government.

Appellant further argues that Dr. MZ's qualifications were not reasonably similar to those of Dr. GH and thus the military judge erred by permitting the Government to consult with Dr. GH.

Article 46, UCMJ, 10 U.S.C. § 846, accords the Defense "equal opportunity to obtain witnesses" as the Government. The United States Court of Appeals for the Armed Forces has noted that "[p]roviding the defense with a 'competent' expert satisfies the Government's due process obligations, but may nevertheless be insufficient to satisfy Article 46 if the Government's expert concerning the same subject matter area

has vastly superior qualifications." *United States v. Warner*, 62 M.J. 114, 119 (C.A.A.F. 2005). The court further stated:

> Article 46 is a clear statement of congressional intent against Government exploitation of its opportunity to obtain an expert vastly superior to the defense's. Requiring that an "adequate substitute" for a defense-requested expert have professional qualifications at least reasonably comparable to those of the Government's expert is a means to carry out that intent where the defense seeks an expert dealing with subject matter similar to a Government expert's area of expertise and where the defense expert is otherwise adequate for the requested purpose.

*Id.* at 120.

In support of his argument that Dr. MZ was inadequate when compared to Dr. GH, Appellant asserts that Dr. MZ, "having only participated in five military courts-martial . . . did not possess a competent working knowledge of military rules of evidence and/or military courts." Dr. GH, on the other hand, "based on his numerous consultations with both government and defense in military courts-martial . . . demonstrated a working knowledge of the military rules of evidence and was able to tailor his testimony to the idiosyncrasies of a military trial." Notably, Appellant has not argued that Dr. MZ was inferior to Dr. GH regarding any other qualification of a forensic psychologist. The military judge compared the qualifications of both experts and found that while Dr. MZ had less experience than Dr. GH consulting in military courts-martial, "Dr. GH [was] neither superior nor vastly superior to Dr. MZ in qualifications" in the field of forensic psychology. We agree with the military judge that Dr. MZ was reasonably comparable to Dr. GH.

Finally, Appellant argues that the Government "gamed" the process in order to deny Dr. GH to the Defense and to gain the benefit of his services for themselves. This claim, however is not supported by the chronology of events. The denial of Dr. GH for Appellant was based upon his unavailability for the initial trial date in July 2014 and the Government only retained Dr. GH in January 2015 after it determined that their original consultant had been exposed to the immunized testimony of Appellant in another trial.

The initial trial date in this case was 22 July 2014. Dr. GH had provided a schedule which showed that he was to be on a family vacation the week of 21 July 2014. Further, prior to the denial, a military justice paralegal confirmed with Dr. GH that he would not be available on the

initial trial date due to his vacation. Dr. MZ represented that he was available for the initial trial date. Subsequent to the denial of the request for Dr. GH and appointment of Dr. MZ, Appellant requested and was granted a continuance based on the schedule of his newly-retained civilian counsel. Notably, Appellant did not renew his request for Dr. GH in light of the continuance and new trial date. Nor did he claim that Dr. MZ was an inadequate substitute until filing his motion to prevent the Government from consulting with Dr. GH.

Meanwhile, the Government had retained Dr. MC as its expert consultant for this case. Dr. MC, however, served as a Government expert in a related case tried in November 2014 where Appellant testified under a grant of immunity. Realizing that Dr. MC might be subject to disqualification for having heard Appellant's immunized testimony during that trial, the Government decided to request a different expert consultant on 13 January 2015. Dr. GH was available for the February 2015 trial dates in Appellant's case and appointed to the Government as their expert consultant.

Contrary to Appellant's assertion that the Government "gamed" the process in order to obtain the services of Dr. GH, his eventual appointment to the Government was the product of his unavailability on the initial July 2014 trial date and availability for trial in February 2015 after the Government determined it needed a consultant to replace Dr. MC. Arguably, it may have been the more prudent course for the Government to obtain a replacement expert other than one that Appellant had previously requested and the convening authority denied, thereby completely avoiding any possible appearance or perception of unfairness.[5] On the facts of this case, however, we find no violation of either the letter or spirit of Article 46, UCMJ, nor unfairness to Appellant.

## B. Deprivation of Choice of Counsel and Failure to Recuse

The genesis of both of the second and third AOE primarily lie in the single question, "Because of IAC?" asked of trial defense counsel by the military judge during an Article 39a, UCMJ, session held the morning of day four of the trial. The Article 39a session concerned the admission

---

[5] "Courts-martial must not only be just, they must be perceived as just. The requirement of Article 46, UCMJ, for equal access to witnesses and evidence secures that just result and enhances the perception of fairness in military justice." *United States v. Lee*, 64 M.J. 213, 218 (C.A.A.F. 2006).

of a pretext phone call between SrA AR and Appellant. Prior to this session, the trial counsel had expressed the intention to offer the audio-recording of the pretext call into evidence. Before the recording could be admitted, redactions were required to conform the recording to the military judge's ruling under Mil. R. Evid. 412.[6] To that end, both trial and defense counsel had spent several hours the prior evening attempting to prepare a redacted version of the recording that complied with the ruling. At the Article 39a session, the trial counsel announced the Government no longer intended to offer the recording into evidence and would instead call a military investigator to testify about statements made during the pretext call. Appellant's civilian counsel indicated the Defense did not yet have a position on whether it objected to this plan. The trial counsel then asked for a ten-minute recess, after which the agent would testify about the pretext call. The following exchange then occurred:

> DC: Judge, with all due respect, . . . we have a reasonable expectation of taking the government [sic] when they say they're going to put a piece of evidence in their case. We spent last night, hours, working on a redaction of the pretext phone call. We walk in this morning, the government says well now we're not going to put on the pretext phone call. . . . I have a reasonable expectation of being able to rely on what my opposing counsel tells me. Ten minutes is not enough time to adjust fire to that. It's just not. It's not fair to my client. We need a chance then, okay. We were operating under the premise that there's going to be a pretext phone call. We're all working towards a 95 percent solution. I thought we had a 95 percent solution. Ten minutes . . . is not enough time for me to be able to say okay this is good or this is not good. We're getting to the point where, you know, much like with the Ambien issue[7] a couple of days ago where Ambien was the big issue in the case. Now Ambien is not an issue in the case. I mean

---

[6] The military judge had ruled that certain evidence regarding the victim's prior sexual behavior was inadmissible and some of this material was present on the recording of the pretext phone call.

[7] Evidence of ingestion of Ambien by SrA AR and its potential effects on her prior to and while visiting Appellant's dorm had previously been a potential prosecution theory based on victim incapacity to consent.

we're getting to the point where my client is not getting a fair trial [i]n our opinion, with all due respect.

MJ: Well, it sounds like if he's not, it's because –

TC: Your Honor, can I say something?

MJ: Before I do?

TC: Yes, Your Honor.

MJ: Go ahead.

TC: Your Honor, the government also spent hours last night figuring out whether and how we're going to put in a pretext phone call. We're certainly allowed to change gears and decide what evidence we want to put on or not put on at any point. The question is simply whether the defense has an objection to our method of proof.

MJ: This is what I see. You guys have discovery. You have notice of witnesses. You know what potential evidence there is and that you both should be prepared to adjust for changes in those things. This isn't something new. The pretext [call] is out there. They've chosen a different way to put it in. I don't understand why it would take a long time for you to be able to adjust to the government changing their presentation of evidence.

DC: Because it affects the way that we are going to otherwise approach the case, potentially. It may not take this long.

MJ: That's what happens in litigation.

DC: I understand that, Judge. And if the fault's on me, then fine, the fault's on me. But my client deserves a fair trial and we're getting close to the point of where, respectfully, I don't think he's getting one.

MJ: Because of IAC?[8]

DC: If that's the issue, Judge, then you know—

MJ: Well, I'm asking you?

---

[8] "IAC" is generally understood by attorneys to refer to "ineffective assistance of counsel" as described in the Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668 (1984).

DC: I don't know what the issue is, Judge. But, I mean, we've got a 412 ruling that says all this stuff is coming in and now we're being told well, maybe it's not going to come in. I've got [the] government telling me Ambien is the nature of this case. No, Ambien is not the nature of the case. . . . [Y]es, we have prepared a case. We prepared a case based on what we reasonably expected was going to come into evidence in this case. That's not what's happening. I'm not saying that that doesn't happen in trials. I understand that happens in trials. But we're putting in eighteen hour days since Saturday to give our client the best defense possible and we need some time to adjust fire now that things have changed a little bit. It's not my fault that the government didn't come into court with a video ready to go. . . . The government is the one who puts in the video. The government then says we object to your [Mil. R. Evid.] 412 motion. Okay. Then we should have walked into court on Monday or Tuesday with a video with [the Mil. R. Evid.] 412 portions redacted; a couple of different versions. That's not unreasonable. That's not on us. That's not why this case is being delayed the way it is. So an extra few minutes for my client when he's got everything in the world on the line, I don't believe is unreasonable.

MJ: Well, I don't agree that that's how the [Mil. R. Evid.] 412 and the video played out. In fact, I think your co-counsel admitted that you all failed to argue—

DC: On one portion.

MJ: —the redaction of the video in your [Mil. R. Evid.] 412 motion; especially when I asked how is this going to come in. So how much of a continuance would you like?

DC: Thirty minutes, Judge.

MJ: All right. . . . So where it stands now is that the defense has requested a recess for thirty minutes before the government can continue its case. I'll take those thirty minutes to decide on [the admission of] the video. I'm not sending the members away. We're going to continue with them, at least through this next witness and then take a break. The video, if any, will be after the lunch break.

9

And it might be an extended lunch break based on the editing.

Appellant conferred with his two defense counsel during the recess that ensued. According to Appellant's later testimony,[9] he personally observed and described his military defense counsel to be "shocked" after the military judge's question regarding "IAC" and as having a deer in the headlights look. Appellant stated, "[i]t was not the look you would want on your lawyer's face in the middle of a court case." Appellant described Mr. WC as being "very frustrated and upset" based on what had just occurred in the courtroom. Appellant asked Mr. WC what "IAC" meant, and Mr. WC explained to him that "it was a legal term for inadequate counsel." Mr. WC further told Appellant that the judge said defense counsel "were not performing their duties as they should. They were inadequate." Appellant again described Mr. WC as very upset. Appellant further testified that Mr. WC explained that "the term IAC is like a legal unicorn" and that "it doesn't happen." According to Appellant, Mr. WC was sad about being in the courtroom and said maybe he was getting too old to practice law. Appellant testified that, "[a]fter watching what had happened and seeing how the lawyers reacted to it, I did not have any more confidence in them. It was kind of scary because it's my life on the line over here."

Several Rule for Courts-Martial (R.C.M.) 802 conferences were held where the parties and military judge discussed Appellant's desire to release his defense counsel and a potential continuance in the court proceedings. Later that day at an Article 39(a) session, the military judge asked Appellant whether he wanted to release his counsel. Appellant said yes and, when asked why, responded:

> Well, ma'am, based on what was discussed during this case and prior work that had been done during this case . . . I don't feel like they can adequately represent me.

In response, the military judge informed the parties that the prior evening she had told a fellow trial judge that the civilian attorney was among the best civilian defense counsel she had seen and that she still believed that to be true. She also relayed that "nothing that I saw . . . gives me pause about . . . either defense counsel's representation of the accused in this case." She further observed that although she "may bark

---

[9] Appellant testified at a later motions hearing to decide among other issues the motion to dismiss the charges for a deprivation of choice of counsel and the motion for the military judge to recuse herself.

and cause counsel to provide me more explanation about things," she had given the defense additional time to prepare its response to the government's change in strategy even though she "may not have liked it and . . . may have shown that on the record . . . ." Based on what she had observed during the trial proceedings, the military judge informed Appellant she had not seen anything that would lead her to believe either defense counsel "have been anything other than fully effective." She recognized, however, that she did not know everything Appellant knew about his counsel and their preparation.

Notwithstanding the military judge's efforts to ensure that Appellant understood she had merely asked a question in response to the comments by his counsel and that she believed his counsel to be effective, Appellant nonetheless maintained that he wanted to release both his civilian and military defense counsel. The military judge immediately approved the release of Mr. WC and set the effective day of release of the detailed military defense counsel to match the date when new military counsel was detailed. A successor military attorney was detailed and Appellant retained a new civilian attorney. When the court reconvened on 24 April 2015, Appellant's new Defense team argued the motions to dismiss the charges for a deprivation of choice of counsel and for recusal of the military judge.

### 1. Deprivation of Choice of Counsel

Appellant contends the military judge's "because of IAC?" question "set off a chain of events that led to the wrongful severance of [his] counsel of choice." He contends that, regardless of what the military judge intended, this question's negative impact on the fairness of his trial required dismissal of the charges or a mistrial. We disagree. Given that the civilian defense counsel's statement that Appellant was "close to not getting a fair trial" was preceded by one that implicated his performance as defense counsel, to wit: "if the fault's on me, then fine, the fault's on me," the military judge's inquiry into what counsel meant by that was reasonable. The military judge merely asked a question; it was not framed as an accusation. Finally, to the extent that it was perceived by Appellant as a negative comment by the military judge about his counsel's performance, the military judge made clear on the record that she believed his counsel were effective.

We review issues affecting the severance of an attorney-client relationship de novo. *United States v. Blaney*, 50 M.J. 533, 539 (A.F. Ct. Crim. App. 1999) (citing *United States v. Iverson*, 5 M.J. 440 (C.M.A.

1978)). Under the Sixth Amendment, the accused in a criminal proceeding has the right to the assistance of counsel.[10] The "core purpose of the counsel guarantee was to assure '[a]ssistance' at trial, when the accused was confronted with both the intricacies of the law and the advocacy of the public prosecutor." *United States v. Ash*, 413 U.S. 300, 309 (1973). The Supreme Court accordingly explained:

> [W]hile the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers.

*Wheat v. United States*, 486 U.S. 153, 159 (1988); *see also Morris v. Slappy*, 461 U.S. 1, 14 (1983) ("[W]e reject the claim that the Sixth Amendment guarantees a 'meaningful relationship' between an accused and his counsel."). Similarly, under the UCMJ, an accused has the right to representation by civilian and military counsel. Article 38(b)(3), UCMJ, 10 U.S.C. § 838(b)(3). The right to counsel of choice under the Sixth Amendment, as well as under the UCMJ, is not absolute and is circumscribed in certain respects. *Wheat*, 486 U.S. at 159 *United States v. Rhoades*, 65 M.J. 393, 394 (C.A.A.F. 2008). For example, "'[t]he need for the fair, efficient, and orderly administration of justice' may outweigh the interest of the accused in being represented by his counsel of choice." *Rhoades*, 65 M.J. at 394; *see United States v. Thomas*, 22 M.J. 57, 59 (C.M.A. 1986); *see also Wheat*, 486 U.S. at 160 (holding the right to select and be represented by one's preferred attorney may be outweighed by the judicial system's "independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them").

In this regard, a military judge "has a responsibility to raise 'on his . . . own initiative, at all appropriate times and in an appropriate manner,' any matter which may promote justice at the trial." *United States v. Hanson,* 24 M.J. 377, 379 (C.M.A. 1987) (quoting ABA Standards, *Special Functions of the Trial Judge*, Standard 6-1.1(a) (1982)). This duty includes ensuring effective counsel for an accused. In *Hanson*, the military judge stated on the record that the detailed defense counsel's performance fell "below the minimum essential standards necessary to an adequate defense." *Id.* at 378. The military judge relieved the

---

[10] U.S. CONST. amend. VI.

defense counsel as detailed defense counsel and indicated that another military counsel should be detailed. The military judge did not sever the attorney-client relationship but left it to the appellant in that case whether to release his original counsel. The United States Court of Military Appeals concluded the military judge had "acted within the bounds of his authority to insure a fair trial" and further found "that the actions had no chilling effect on the legal representation provided appellant." *Id.* at 380.

The military judge in this case likewise acted within the bounds of her authority and did not cause a wrongful severance of Appellant from his counsel. Nonetheless, according to Appellant's testimony on the motions, the defense team had an adverse reaction to the military judge's question, apparently believing she had said they were performing inadequately. The military attorney was uncertain about what to do next while the civilian defense attorney became dejected to the point that he questioned his future in the law. Understandably, this caused Appellant to question whether his attorneys should continue to represent him. He ultimately lost confidence in them and voluntarily released them from further representation, even after the military judge complimented his civilian attorney and told Appellant she had observed his counsel to be "fully effective" so far in the trial. When he asked to release the counsel, Appellant told the military judge that his decision to release them was based in part on "prior work that had been done in the case." The military judge did not ask the Appellant on the record to elaborate on this aspect of his dissatisfaction. The military judge then allowed the Appellant to release his counsel.

Given this, we find the actions of the military judge did not deprive Appellant of his counsel of choice. While she could have simply asked the defense counsel to clarify what he meant and avoided mention of IAC at all, her discussion with the defense counsel was not objectively unreasonable. It clearly was not intended to be an accusation that the counsel were ineffective. Nor was it intended to interfere with the Appellant's relationship with them as she made abundantly clear on the record once informed of Appellant's desire to release his counsel. Nevertheless his counsels' reaction to this exchange with the military judge, along with his concern about "prior work that had been done during the case," led Appellant to lose confidence in their ability to continue as his attorneys. Appellant then chose to voluntarily release them from further representation. Under these circumstances, the military judge did not deprive the Appellant of his counsel of choice.

### 2. Recusal

Finally, Appellant avers the military judge abused her discretion when she denied Appellant's motion to recuse herself. We disagree. We review a military judge's refusal to recuse herself for an abuse of discretion. *United States v. Butcher*, 56 M.J. 87, 90 (C.A.A.F. 2001).

In addition to the "IAC" question, Appellant also testified at the motions hearing that he believed that the military judge was treating the Government counsel and his counsel differently; that she was "harping on them" more than the Government. Appellant believed that even though the Government was not prepared for certain things, the military judge just allowed them to "skate by," as opposed to his lawyers who were "harped on about what they were doing." Contrary to the Appellant's perception, the military judge hardly let the Government "skate by" when the Government was not ready to call its first witness in the trial before members. The military judge asked trial counsel "so you just think I should take a break while you get your case together?" She then chastised the Government in front of the members for its "poor planning" and told counsel she expected them to do better. Her concerns about the slow pace of the trial were communicated to both sides. On another occasion the military judge openly doubted that the Government was ready to finish its case, an implication trial counsel took issue with. Notably, in contrast to a couple of occasions with criticism targeted at the Government, none of the military judge's comments at issue toward trial defense counsel occurred on the record in front of members.

Questioning of defense counsel by a trial judge is not uncommon, not inappropriate, and not evidence of bias. *Cf. Liteky v. United States*, 510 U.S. 540, 555 (1994) ("[J]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge."); *United States v. Gray* 51 M.J. 1, 51–52 (C.A.A.F. 1999) (finding military judge's criticism of defense counsel's failure to interview possible defense witnesses and statement that defense counsel was unable to ask intelligible voir dire questions was not biased or inappropriate); *United States v. Cooper*, 51 M.J. 247, 251 (C.A.A.F. 1999) (holding a military judge's personal expression of irritation with a defense counsel did not divest him of the necessary appearance of impartiality); *United States v. Loving*, 41 M.J. 213, 257 (C.A.A.F. 1994) ("Generally, courtroom clashes between counsel and the judge do not constitute disqualifying bias.").

The standard for identifying the appearance of bias of a military judge is an objective one: "[A]ny conduct that would lead a reasonable [person] knowing all the circumstances to the conclusion that the judge's impartiality might reasonably be questioned." *Hasan v. Gross*, 71 M.J. 416, 418 (C.A.A.F. 2012) (quoting *United States v. Kincheloe*, 14 M.J. 40, 50 (C.M.A. 1982)). "There is a strong presumption that a judge is impartial, and a party seeking to demonstrate bias must overcome a high hurdle, particularly when the alleged bias involves actions taken in conjunction with judicial proceedings." *United States v. Quintanilla*, 56 M.J. 37, 44 (C.A.A.F. 2001). Remarks, comments, or rulings of a military judge do not constitute bias or partiality, "unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Id.* at 37 (quoting *Liteky*, 510 U.S. at 555).

Further, the Supreme Court has made clear that "expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even having being confirmed as federal judges, sometimes display" do not establish bias or partiality. *Liteky*, 510 U.S. at 555–56. "A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune." *Id.* at 556.

The military judge's "expressions" in this case remained well "within the [judicial] bounds" and her "remarks, comments, [and] rulings" did not "display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Quintanilla*, 56 M.J. at 37. She did not abuse her discretion in denying the motion to recuse herself.

### III. CONCLUSION

The findings of guilt and the sentence are correct in law and fact and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

KURT J. BRUBAKER
Clerk of the Court